## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR MEDICAL PROGRESS, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Defendant. | Civil Action No. 21-642 (BAH) <br><br> Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiff Center for Medical Progress, a nonprofit investigative journalism organization "dedicated to monitoring and reporting on medical ethics and advances," Compl. ¶ 3, ECF No. 1, challenges the response of the defendant, the U.S. Department of Health and Human Services ("HHS"), and its responsive component, the National Institutes of Health ("NIH"), to a request submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records pertaining, *inter alia*, to a grant application submitted by the University of Pittsburgh to serve as the "GUDMAP Tissue Hub and Collection Site" for NIH's subcomponent, the National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK"). Compl. ¶ 5. The parties have now cross-moved for summary judgment. Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 17; Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 19.

For the reasons set forth below, summary judgment is granted in part and denied in part, without prejudice, to defendant and denied, without prejudice, to plaintiff.

1

## I.      BACKGROUND

Pertinent background underlying plaintiff's FOIA request is briefly described, followed by review of the FOIA Request and NIH's responses thereto, both before and after initiation of this lawsuit.

### A.      NIH's GUDMAP Grant

NIDDK, a subcomponent of NIH, "awards grants and contracts to third parties to engage in research on diabetes, digestive and kidney diseases."  First Decl. of Gorka Garcia-Malene, FOIA Officer, NIH, HHS ("First NIH Decl.") ¶¶ 6, 10, ECF No. 17-3.  For the period of September 15, 2016 through May 31, 2021, NIDDK awarded the University of Pittsburgh a grant to "leverage the resources of its Health Science Tissue Bank to function as a part of the GenitoUrinary Development Molecular Anatomy Project ("GUDMAP") Tissue Hub and Tissue Gathering site."  *Id.* ¶ 20.  Specifically, the University of Pittsburgh would help procure, process, and disburse genitourinary tissue for the scientific community belonging to the GUDMAP project.

### B.      Plaintiff's FOIA Request

On April 28, 2020, plaintiff submitted a FOIA request to a subcomponent of NIH, seeking access to three research grant applications, including the University of Pittsburgh's grant application to serve as the GUDMAP Tissue Hub and Tissue Gathering site.  Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF") ¶ 4, ECF No. 17-2.[1]  On the same day, NIH acknowledged receipt of the request.  *Id.* ¶ 5.  NIH began to search for responsive records, *id.* ¶ 6, and, between May 2020 and June 2020, plaintiff and a government information specialist for NIH exchanged a series of emails regarding the request, Pl.'s Further Statement of Material Facts

---

[1]      Plaintiff challenges only defendant's response as to the University of Pittsburgh grant application and renewals, and thus the agency's response as to the other two grant applications is not at issue.  *See* Joint Status Report ("JSR") (Oct. 27, 2021) ¶ 4, ECF No. 15.

("Pl.'s SMF") ¶¶ 45–54, ECF No. 19.  After these email exchanges were unsuccessful in narrowing the request, *id*., on August 10, 2020, the government information specialist informed plaintiff that the requested records would "be sent to NIH FOIA for final release determination." Def.'s SUMF ¶ 6; *id*. ¶ 7 (noting that plaintiff was advised, in September 2020, that request was with the NIH FOIA office (citing First NIH Decl. ¶ 18)).

### C.   Procedural History and Releases of Requested Records

Nearly one year after submitting its FOIA request, plaintiff initiated this litigation, on March 10, 2021, alleging that defendant violated FOIA by failing to (1) determine whether to comply with plaintiff's request, (2) notify plaintiff of a determination and reasons for that determination, (3) advise plaintiff of a right to appeal any adverse determinations, and (4) produce the requested records or otherwise demonstrate that the requested records are exempt. Compl. ¶ 7.  After filing its answer, defendant began processing responsive records and releasing records to plaintiff in three installments: on June 7, 2021, Def.'s SUMF ¶ 9; Joint Status Report ("JSR") (July 16, 2021) ¶ 2, ECF No. 12, which was revised and reproduced on June 8, 2021, Pl.'s SMF ¶ 55, and on July 8, 2021, Def.'s SUMF ¶ 9; JSR (July 16, 2021) ¶ 2.  On September 30, 2021, defendant provided plaintiff with a draft *Vaughn* index for documents that were withheld in whole or in part, JSR (Oct. 15, 2021) ¶ 2, ECF No. 14, which index plaintiff used to narrow this dispute only to defendant's withholding of certain information regarding the University of Pittsburgh's grant application, JSR (Oct. 27, 2021) ¶¶ 2, 4.[2]

Under FOIA Exemptions 4, 5, and 6, defendant initially released, in full or in part, a total of 153 pages and withheld in full a total of 39 pages of records as to the University of Pittsburgh's grant, for a total of 192 responsive pages.  Def.'s SUMF ¶ 12.  The 39 pages

---

[2]    Plaintiff does not challenge the adequacy of defendant's search for responsive records.  JSR (Oct. 27, 2021) ¶ 4.

withheld in full, under FOIA Exemptions 4 and 6, are described as follows: documents titled "Biographical Sketch" (24 pages), research references (3 pages), and nine letters of support (12 pages). *Id.* ¶¶ 10, 12.  Under Exemption 4, defendant withheld information related to six categories: (1) salary information pertaining to University of Pittsburgh staff, (2) the number of tissue disbursements made and shipped; (3) the names of sites where the University of Pittsburgh procures tissue; (4) costs for supplies, shipping, and tissue embedding or processing, storage, and disbursement, (5) the anticipated number of tissue collections for GUDMAP per year, and (6) letters of support submitted by University of Pittsburgh clients in support of the university's grant application. *Id* ¶ 15.  Under Exemption 6, defendant withheld information related to six categories of information that are somewhat overlapping with the categories under Exemption 4: (1) the individual salaries of third parties administering the University of Pittsburgh's grant; (2) percent labor effort; (3) the names, job titles, location of tissue procurement sites, and other identifying information of University of Pittsburgh employees involved in administering the grant, with the exception of the name of the principal investigator; (4) the personal signatures of University of Pittsburgh employees; (5) names and identifying information of third parties supporting the grant; and (6) identifying information pertaining to those providing letters of support submitted with University of Pittsburgh's grant application. *Id.* ¶ 32.

While briefing on the pending cross-motions for summary judgment was underway, defendant made additional productions on January 10, 2022, Pl.'s SMF ¶ 63, and on February 21, 2022, Def.'s Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Summ. J. ("Def.'s Opp'n"), Ex. 1, Second Decl. of Gorka Garcia-Malene, FOIA Officer, NIH, HHS ("Second NIH Decl.") ¶¶ 5–6, ECF No. 21-1, upon determining, due in no small part to plaintiff's prompting, that certain previously withheld information was either publicly available or was no longer

subject to withholding, *id*.  The revised production reduced the total pages withheld in full from thirty-nine to only four.  *Id.* ¶ 15.

After briefing was complete, the Court directed defendant to supplement the record by (1) updating and submitting a *Vaughn* Index reflecting the justification for any remaining withholdings, (2) clarifying whether defendant had conceded summary judgment to plaintiff for any withholdings made, in whole or in part, pursuant to FOIA Exemption 5, and (3) addressing plaintiff's position that certain withholdings under FOIA Exemption 4 and 6 were not appropriate due to the availability of the information in the public domain.  Min. Order (Aug. 19, 2022).  In response, defendant acknowledged that certain withholdings had relied on Exemption 5, but stated that this issue was now moot because one withholding mistakenly referenced Exemption 5 and should have referenced Exemption 6, and the remaining Exemption 5 withholding would be released in a subsequent production.  Def.'s Suppl. Record ("Def.'s Suppl.") at 2–3, ECF No. 23.  Defendant further acknowledged certain withholdings under Exemptions 4 and 6 consisted of information either in the public domain or inconsistently redacted by defendant and therefore inadvertently released.  Third Decl. of Gorka Garcia-Malene, FOIA Officer, NIH, HHS ("Third NIH Decl.") ¶¶ 10–11, 19–23, ECF No. 23-2.  Defendant subsequently released this information to plaintiff on August 26, 2022.  *Id.* ¶ 27.  Defendant was then directed to submit yet another revised *Vaughn* Index.  Min. Order (Aug. 23, 2022).

Defendant's latest revised *Vaughn* Index fails to identify consistently the specific withholdings covered by each of the broad challenged categories described by defendant in its motion for summary judgment and, thus, has left the Court to speculate as to which specific withholdings are actually at issue in this lawsuit and which withholdings and documents the

parties agree were appropriately withheld.  *See generally* Revised *Vaughn* Index, ECF No. 25-1.
Certainly, the combined use of *Vaughn* indices and detailed declarations is an acceptable practice
for an agency to justify its application of an exemption.  *See Jud. Watch, Inc. v. Food & Drug
Admin*, 449 F.3d 141, 148 (D.C. Cir. 2006) (agency's "decision to tie each document to one or
more claimed exemptions in its index and then summarize the commonalities of the documents
in a supporting affidavit is a legitimate way of serving the same functions" of the *Vaughn* index
by "organiz[ing] the withheld documents in a way that facilitates litigant challenges and court
review of the agency's withholdings").  Nevertheless, the declarations are most helpful when tied
to the specific withholdings described in the indices.  *See Jud. Watch, Inc. v. U.S. Dep't of Just.*,
800 F. Supp. 2d 202, 214 (D.D.C. 2011) (finding that an agency's "*Vaughn* indices and
declarations are adequate" where "declarations work in conjunction with the *Vaughn* indices by
dividing the withheld documents into specific categories based on the nature of the document
(the category numbers are cross-referenced accordingly in the *Vaughn* indices), linking each
category (and in turn each document) to a particular FOIA exemption, and articulating what the
documents in each group reflect and why they fall within the specified FOIA exemption").  The
lack of specificity in this case regarding both the identification of withholdings in the *Vaughn*
indices that are disputed and the precise connection between the categories discussed in the
declarations and the withholdings listed in the *Vaughn* indices has significantly complicated the
Court's task of resolving the parties' motions.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment
only if there is no genuine issue of material fact and judgment in the movant's favor is proper as
a matter of law."  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir.

2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805

(D.C. Cir. 2006)); *see also* FED. R. CIV. P. 56(a).  "In FOIA cases, summary judgment may be

granted on the basis of agency affidavits if they contain reasonable specificity of detail rather

than merely conclusory statements, and if they are not called into question by contradictory

evidence in the record or by evidence of agency bad faith."  *Aguiar v. Drug Enf't Admin.*, 865

F.3d 730, 734–35 (D.C. Cir. 2017) (quoting *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208,

215 (D.C. Cir. 2013)); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833

(D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in

dispute and if it demonstrates 'that each document that falls within the class requested either has

been produced . . . or is wholly exempt from the Act's inspection requirements.'" (omission in

original) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most FOIA cases "can

be resolved on summary judgment."  *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521,

527 (D.C. Cir. 2011).

  FOIA was enacted "to promote the 'broad disclosure of Government records' by

generally requiring federal agencies to make their records available to the public on request."

*DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *Dep't of Just.*

*v. Julian*, 486 U.S. 1, 8 (1988)).  Agencies are therefore statutorily mandated to "make . . .

records promptly available to any person" who submits a request that "reasonably describes such

records" and "is made in accordance with [the agency's] published rules."  5 U.S.C. §

552(a)(3)(A).  To balance the public's interest in governmental transparency and "legitimate

governmental and private interests [that] could be harmed by release of certain types of

information," *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019)

(quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA contains nine exemptions, set forth

in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'"

*Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (first quoting *EPA v. Mink*, 410 U.S. 73, 79

(1973); and then quoting *Abramson*, 456 U.S. at 630); *see also Citizens for Resp. & Ethics in*

*Wash.* ("*CREW*") *v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). "[T]hese limited

exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective

of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts "to enjoin the agency from withholding agency records

and to order the production of any agency records improperly withheld from the complainant." 5

U.S.C. § 552(a)(4)(B). When an agency invokes an exemption to disclosure, district courts must

"determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't*

*of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). The statute "places the burden 'on the

agency to sustain its action,' and the agency therefore bears the burden of proving that it has not

'improperly' withheld the requested records." *CREW* v. *U.S. Dep't of Just.*, 922 F.3d 480, 487

(D.C. Cir. 2019) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Just. v.*

*Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also U.S. Dep't of Just. v. Landano*, 508 U.S.

165, 171 (1993) ("The Government bears the burden of establishing that the exemption

applies."); *DiBacco v. U.S. Dep't of Army* ("*DiBacco II*"), 926 F.3d 827, 834 (D.C. Cir. 2019)

("'An agency withholding responsive documents from a FOIA release bears the burden of

proving the applicability of claimed exemptions,' typically through affidavit or declaration."

(quoting *DiBacco I*, 795 F.3d at 195)). This burden does not shift even when the requester files a

cross-motion for summary judgment because the agency ultimately "bears the burden to establish

the applicability of a claimed exemption to any records or portions of records it seeks to

withhold," *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir.

2016), while "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

The agency may sustain its burden through a *Vaughn* index, and supporting affidavits or declarations, that "describe[ ] the justifications for withholding the information with specific detail, demonstrate[ ] that the information withheld logically falls within the claimed exemption, and [are] not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *DiBacco II*, 926 F.3d at 834 (quoting *DiBacco I*, 795 F.3d at 196); *CREW*, 746 F.3d at 1088; *see also Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 150 (D.D.C. 2018) ("An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate."). "'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears "logical" or "plausible."'" *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

## III.   DISCUSSION

Plaintiff contests invocation of Exemptions 4 and 6 as to all but one of the six Exemption 4 categories and as to three of the six Exemption 6 categories claimed by defendant to be exempt from release.  Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 7, 15, ECF No. 19; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 5–11,

ECF No. 22.[3]  Additionally, plaintiff disputes that defendant properly segregated releasable

information on the remaining pages withheld in full, and accuses the agency of bad faith.  Pl.'s

Opp'n at 19–22; Pl.'s Reply at 11–14.  These topics are addressed *seriatim*.[4]

### A.  Withholdings under FOIA Exemption 4

As noted, defendant withheld six categories of information pursuant to Exemption 4.

While the parties do not dispute that the first category regarding salary information of University

of Pittsburgh staff, may be withheld, Pl.'s Opp'n at 7, plaintiff challenges the remaining five

categories—i.e., (2) the number of tissue disbursements made and shipped; (3) the names of the

sites from which the University of Pittsburgh procures tissue; (4) costs for supplies, shipping,

and tissue embedding or processing, storage, and disbursement, (5) the anticipated number of

tissue collections for GUDMAP per year, and (6) letters submitted by University of Pittsburgh

clients in support of its grant application.  Def.'s Mem. at 5, ECF No. 17-1; Def.'s SUMF ¶ 15—

as either not commercial or not confidential, Pl.'s Opp'n at 7–12, or as failing the foreseeable-

harm statutory requirement, *id.* at 12–14, and therefore not covered by this exemption.

---

[3]     Plaintiff also contests, in a footnote, defendant's two withholdings made pursuant to Exemption 5, pointing to defendant's failure to make any legal argument or claim of exemption as to Exemption 5 in its motion for summary judgment, *see* Pl.'s Opp'n at 4 n.3, or in its opposition to plaintiff's cross-motion, *see* Pl.'s Reply at 2 n.1. Defendant responds that this issue is moot because the one withholding under Exemption 5 has been released and the second withholding referencing Exemption 5 was erroneous and the withholding actually was made under Exemption 6.  Def.'s Suppl. at 3.  Based on this record, summary judgment is denied as moot to both parties as to any Exemption 5 withholding.

[4]     Plaintiff requests that the Court "view the records withheld in full *in camera*" to "determine whether there is segregable information," Pl.'s Reply at 12, arguing that the subsequent release of information previously withheld in full "calls into question all of the records withheld in full" and "necessitates a review of whether any information could be segregated," *id.*  FOIA provides that a district court "may examine the contents of . . . agency records in camera" at its discretion, 5 U.S.C. § 552(a)(4)(B), "but 'it by no means compels the exercise of that option,'" *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (quoting *Juarez v. Dep't of Just.*, 518 F.3d 54, 60 (D.C. Cir. 2008)).  "If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents."  *Mobley v. C.I.A.*, 806 F.3d 568, 588 (D.C. Cir. 2015) (quoting *ACLU*, 628 F.3d at 626).  As explained below, the first two of these requirements are satisfied in the instant case, and plaintiff's allegations of agency bad faith have no merit. Plaintiff's request for *in camera* review is therefore denied.

Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Where withheld records do not contain trade secrets, an agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential" to sustain the burden of showing that Exemption 4 was properly applied. *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). Here, the parties do not dispute that all of the documents came from a "person," meeting this prerequisite for application of Exemption 4, Pl.'s Opp'n at 6 n.5, leaving only the "commercial" and "confidential" prongs under dispute. Upon satisfying the Exemption 4 requirements, the government must then also satisfy FOIA's statutory foreseeable-harm requirement. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I) ("An agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by [one of the nine FOIA exemptions] . . . .").

Defendant's burden of showing that the challenged categories contain commercial information will be addressed first, followed by examination of whether the information is confidential or privileged. Finally, for any category of information found to be both commercial and confidential, the Court will evaluate whether defendant has met its burden of showing that the disclosure of the withheld documents would cause foreseeable harm to an Exemption 4 interest.

### 1. *Sufficiency of Showing that the Withheld Information Is Commercial*

The term "commercial" is not defined in the FOIA. Absent a precise statutory definition or clarity from the legislative history, the D.C. Circuit has "consistently held that [this] term . . . in [Exemption 4] should be given [its] ordinary meaning[ ]." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290; *see also Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir.

2002).  "[I]nformation is 'commercial' under this exemption if, 'in and of itself,' it serves a

'commercial function' or is of a 'commercial nature.'"  *Nat'l Ass'n of Home Builders*, 309 F.3d

at 38 (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)).

Thus, "records that actually reveal basic commercial operations, such as sales statistics, profits

and losses, and inventories, or relate to the income-producing aspects of a business," fall within

the scope of "commercial" information.  *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.  For

instance, documents that contain "revenue, net worth, income, and EBITDA" information are

plainly commercial.  *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C.

2009); *see also Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986)

(holding that customer lists constitute commercial information); *Racal–Milgo Gov't Sys., Inc. v.

Small Bus. Admin.*, 559 F. Supp. 4, 6 (D.D.C. 1981) (finding that Exemption 4 shielded

information "much more sensitive than mere prices," such as "audits of private concessions in

national parks; technical proposals for development of a system to analyze gases generated by

petroleum refineries; general selling prices, inventory balances, profit margins, purchase activity,

freight charges, costs of goods sold, and customer names, obtained from a utility in the course of

a government investigation; appraised value for customs duty assessment purposes of imported

machinery parts; design recommendations, design concepts, a customer list, and biographical

data on key employees; and computer usage, manpower allocation, travel costs, biographical

data on employees, and detailed cost data from a contract with the Government" (footnotes

omitted)).  The scope of "commercial" information has also been applied more broadly to

records containing information in which the provider of the records has "a commercial interest."

*Baker & Hosteler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (finding

letters describing favorable market conditions for domestic lumber companies "plainly contain

commercial information within the meaning of Exemption 4"); *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290 (finding information to be commercial when it was helpful or "instrumental" to the provider's business interests).  In sum, "[t]he touchstone is whether the disclosure of the contested information 'could . . .  materially affect[ ]' the 'commercial fortunes' of the business." *CREW v. U.S. Dep't of Just.*, 567 F. Supp. 3d 204, 211 (D.D.C. 2021) (omission and second alteration in original) (quoting *Baker & Hostetler LLP*, 473 F.3d at 319).  Here, plaintiff challenges only whether information in Categories Two, Three, Five, and Six contain commercial information.[5]

### a.   Categories Two, Three, and Five

Plaintiff asserts that defendant has failed to "articulate[] the commercial purpose of" categories Two, Three and Five—i.e., the number of tissue disbursements made and shipped, the names of the sites from which the University of Pittsburgh procures tissue, and the anticipated number of tissue collections for GUDMAP per year, respectively.  Pl.'s Opp'n at 8–9; Pl.'s Reply at 5 ("Defendant fails . . . to explain[] how *each category* of information has a commercial interest." (emphasis in original)).  Defendant is correct that this assertion is completely contradicted by the record.  Def.'s Opp'n at 6–7.

The agency's first declaration explains how each of these categories of information "pertains to the University of Pittsburgh's strategies for obtaining grants in that this information helps the University of Pittsburgh provide tissue samples to clients at a price equivalent to the costs to procure, prepare and send the samples."  First NIH Decl. ¶ 25.  The declaration further

---

[5]     Plaintiff asserts no claim that Category Four—i.e., costs for supplies, shipping, and tissue embedding or processing, storage, and disbursement—fails to qualify as commercial information, *see* Pl.'s Opp'n at 7–9, and thereby concedes this point, *see* D.D.C. LCvR 7(b); *see also Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) ("[Local Civil Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded." (quoting *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014))).

highlights the significance of each category and makes clear that, taken together, releasing "[these categories of] information is equivalent to releasing line-item pricing information for individual services, and provides the competition with the precise figure[s] it needs to undercut the University of Pittsburgh in future grant requests for similar services." *Id.* ¶ 27.  The Revised *Vaughn* Index adds additional details to support these claims.  For example, it clarifies that "[t]he number of tissue disbursements [and anticipated number of tissue collections per year] [are] confidential commercial information because [they] directly reflect[] the volume of business conducted" by the University of Pittsburgh.  Revised *Vaughn* Index at 5–6, 23–24, 85–86.  Such information is clearly instrumental to the university's commercial fortunes and falls squarely within the types of information courts in this Circuit have recognized as "commercial."  *See, e.g.*, *Braintree Elec. Light Dep't v. Dep't of Energy*, 494 F. Supp. 287, 290 (D.D.C. 1980) ("[All information concerning a competitor's pricing mechanism becomes helpful" or "vital information," including inventory balances and information that would allow competitor's "to learn a company's capacity for expansion and cost of overhead").[6]

Similarly, defendant's explanations sufficiently establish the commercial nature of information in Category Three—the names of sites from which the University of Pittsburgh procures tissues.  According to defendant, this information includes the specific locations within the procurement site where tissues are collected and processed as well as other sites where tissue is processed.  Def.'s Opp'n at 6 n.4.  As with Categories Two and Five, defendant explained that

---

[6]    Plaintiff challenges whether the number of tissue disbursements can be "essential" to the University of Pittsburgh's strategies for obtaining grants as the university made publicly available the total number of disbursements in its initial grant application.  Pl.'s Reply at 6 & n.6.  Plaintiff's argument confuses the commercial interest prong with the confidential prong of the Exemption 4 prerequisites.  Commercial information simply covers information that discloses the basic operations of a business or reveals information that is vital or helpful to its functions.  *Baker & Hostetler LLP*, 473 F.3d at 319.  Whether that information is publicly available or not is a completely separate matter from whether it relates to a business's operations or commercial functions.  Defendant has sufficiently described the commercial function of the number of tissue disbursements since such disbursements inherently disclose the university's volume of business.  *See* Revised *Vaughn* Index at 5.

this Category Three information is "commercial" because it pertains to the University of Pittsburgh's pricing mechanisms.  First NIH Decl. ¶¶ 25, 27 (noting that the procurement site location and size factors into "the costs of administering the grant").  Defendant also highlights the University of Pittsburgh's commercial interest in this information as it discloses the university's internal supply arrangements.  Third NIH Decl. ¶ 24 (explaining that "information related to the identification of the entity with which an institution conducts its work[] constitutes confidential commercial information, including information related to their internal supply arrangements").  Indeed, commercial operations' suppliers are critical to the pricing of the operations and the product and are plainly commercial in nature.[7]  *See Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 102 (D.D.C. 2013) (explaining that information disclosing "intimate aspects of a . . . business such as supply chains" is "plainly" commercial (quoting *Watkins v. U.S. Bur. of Customs and Border Protection*, 643 F.3d 1189, 1195 (9th Cir. 2011)));  *CREW*, 567 F. Supp. 3d at 212–13 (recognizing that a business's sourcing inputs and

---

[7]     Defendant's explanation evolved in the agency's third declaration, and in both the initial and revised *Vaughn* indices, to include that this information must be protected because of "the important issue of employee safety."  Third NIH Decl. ¶ 24; Initial *Vaughn* Index at 46–51, 62–65, ECF No. 23-1 (noting for the Exemption 4 justification that (1) "[t]he location of sensitive research facilities along with the associated security measures to protect those locations is a commercial decision normally kept confidential by the University in order to ensure the security of the location," and (2) "the release of the physical location where the research is being conducted could assist in identifying the individuals participating on the project," and "would identify a location where they could be found and open them to harassment or physical violence at their workplace"); Revised *Vaughn* Index at 58–59, 61, 63–64, 83–85, 90–91 (claiming the same).  Defendant's identification of interests related to employee safety is more confusing than helpful in the context of Exemption 4 withholdings.  Assuredly, information related to a business's internal security measures, which are often integral to its productivity and operations, constitute "commercial" information.  *See, e.g., Bowen v. U.S. Food & Drug Admin.*, 925 F.2d 1225, 1227–28 (9th Cir. 1991) (holding that records describing "quality control and internal security measures of private business entities" contained confidential commercial information subject to withholding under Exemption 4).  This Circuit, however, has held that Exemption 4 does not cover concerns about the capability of information to lead to unwarranted intrusions on an individual's privacy.  Such concerns fall under the province of Exemption 6.  *See Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008) (explaining that Exemption Four cannot be used to "lawfully withhold business records on grounds of individual privacy," as "personal privacy interests are not 'a relevant concern under the fourth exemption,' but are under Exemption 6" (quoting *Nat'l Parks and Conservation Ass'n v. Kleppe*, 547 F.2d 673, 685–86 (D.C. Cir. 1976)); *see also Nat'l Bus. Aviation Ass'n, Inc. v. F.A.A.*, 686 F. Supp. 2d 80, 87 (D.D.C. 2010) (finding that Exemption 4 "deals with confidential *commercial* information and not with personal privacy or security" (emphasis in original)).

production output information is "commercial").[8]  Consequently, the Court finds that Categories

Two, Three, and Five all constitute "commercial" information within the meaning of Exemption

4.

### b.  Category Six

As to Category Six, the letters in support of the University of Pittsburgh's grant

application, plaintiff asserts that defendant has conceded that this category does not constitute

commercial information.  Pl.'s Opp'n at 8; Pl.'s Reply at 6 n.7.  Plaintiff, in its haste to identify a

concession, skipped over pertinent language in the agency's declaration.  Although the agency's

declarant stated that the university "has a commercial interest in all categories of information

withheld under Exemption 4—*except for the letters of support for the Pittsburgh grant*—because

this information pertains to Pittsburgh's strategies for obtaining grants," Pl.'s Opp'n at 8

(emphasis in original) (quoting First NIH Decl. ¶ 25 and Def.'s SUMF ¶ 23), two commercial

interests were also specifically identified as attached to the letters: (1) the fact that they identify

clients of the university that purchase the tissue its procures, First NIH Decl. ¶ 28, and (2) the

fact that some of the letters also disclose the location of procurement sites, *id*.  *See also* Second

NIH Decl. ¶ 8 (noting that the commercial interests identified in the first declaration for the

withheld letters of support "was Pittsburgh's commercial interest in the identify of its clients"

and "the location of procurement sites").[9]  The identities of the university's customers plainly

constitute commercial information.  *See, e.g.*, *Greenberg*, 803 F.2d at 1216 (holding that

---

[8]     Plaintiff questions how the locations within procurement and processing sites can pertain to the university's
strategy for obtaining grants if the sites themselves are publicly available information.  Pl.'s Reply at 5–6.  As
explained *supra* in note 6, whether the sites are public knowledge has no bearing on if the locations within them
relate to the *commercial* aspects of the university's business operations.

[9]     The first NIH declaration states that NIH withheld six letters of support, First NIH Decl. ¶ 28, but
defendant's motion for summary judgment and the subsequent agency declaration clarified that NIH in fact withheld
nine letters of support, Def's Mem. at 8; Second NIH Decl. ¶¶ 8, 15.

customer lists constitute commercial information); *Racal–Milgo Gov't Sys.*, 559 F. Supp. at 6 (finding the same for customer names).[10]

### c.   Belatedly Identified and Otherwise Not Addressed Categories

As noted, defendant released a revised production of records to plaintiff on August 26, 2022, and, in turn, the Court requested that defendant submit a revised *Vaughn* Index "that reflects for each withholding (1) the category of withheld information to which it belongs . . . , and (2) whether the information is no longer withheld because it has been released in a revised production and the reason for its release," noting that the "submission of a *Vaughn* Index that fails to identify withholdings that are no longer applicable and that fails to identify which withholding corresponds to [defendant's] own identified categories places a significant burden on the Court . . . and frustrates the Court's efforts to make definitive rulings on disputed categories of withheld information."  Min. Order (Aug. 23, 2022).  Although the Revised *Vaughn* Index includes a column titled "Category to Which the Withheld Information Belongs," *see, e.g.*, Revised *Vaughn* Index at 1, several of the categories detailed within the column do not correspond to the categories identified by defendant in its motion for summary judgment, statement of undisputed material facts, or the agency's declarations.  In short, defendant appears to have introduced several new categories of withheld information not covered in its briefing or declarations.

As best the Court can discern, under Exemption 4, these previously unidentified categories consist of: (1) "proprietary scientific practices," *id.* at 61–62, 64, (2) "other support,"

---

[10]    Neither the initial nor the revised *Vaughn* index cites Exemption 4 as a basis for withholding the letters of support.  Initial *Vaughn* Index at 67–68; Revised *Vaughn* Index at 91–92.  Despite this oversight, in light of defendant's consistent claims in its briefing and declarations that Exemption 4 applies to the letters of support, this analysis addresses whether defendant has met all the requirements to claim withholding of information related to client identities under Exemption 4.

*id.* at 27–28, 43,[11] and (3) "Methodology Pittsburgh used to accomplish its goals," *id.* at 83, but the record is entirely unclear whether these categories of withholdings are disputed or not. Consequently, summary judgment is denied, without prejudice, with respect to each of these categories so that the propriety of any such withholding, if disputed, may be appropriately reviewed.

> ### 2.      *Sufficiency of Showing that the Withheld Information is Confidential*

A "commercial" document may only be withheld under Exemption 4 if it is "privileged" or "confidential." 5 U.S.C. § 552(b)(4). The Supreme Court recently clarified the meaning of confidential under Exemption 4. Commercial or financial information is confidential if it is "(1) both customarily and actually treated as private by its owner and (2) provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019). The first requirement has long been the rule in this Circuit with respect to information provided to agencies voluntarily, *see Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879–80 (D.C. Cir. 1992) (en banc), but *Food Marketing* expanded its application to all commercial information provided to agencies whether voluntarily or otherwise. Although the Supreme Court did not "need to resolve" whether the second condition—assurance of privacy—was necessary in every case, whether the agency provided an assurance of privacy is undoubtedly relevant to determining whether commercial information possessed by an agency is "confidential." *Food Mkgt.*, 139 S. Ct. at 2363; *see also Ctr. for Investigative Reporting v. U.S. Customs and Border Protection*, 436 F. Supp. 3d 90, 112–13 (D.D.C. 2019). "In addition, in

---

[11]      Defendant admits that "other support" of the principal investigator by private companies was "[n]ot identified as a category in [its] declarations," *see* Revised *Vaughn* Index at 28–29, but claims this category is not in contention, *id.*, citing an email exchange with plaintiff's counsel in which plaintiff's counsel clarifies that "[p]laintiff is challenging [most] of the (b)(4) withholdings (minus those items mentioned above such as salaries)," Def.'s Opp'n, Ex. 4 at 2, ECF No. 21-4 (second alteration in original). This email exchange does not clearly indicate that "other support" is an unchallenged type of information and therefore summary judgment is denied to both parties as to this category of information.

assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass*, 975 F.2d at 872, 878–80)); *see also Food Mktg.*, 139 S. Ct. at 2363 (explaining that "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by *the person* imparting it," as "it is hard to see how information could be deemed confidential if *its owner* shares it freely" (emphasis added)).

### a. Customarily and Actually Treated as Private

Plaintiff contends that defendant has not satisfied the first prong of the *Food Marketing* test—that the withheld information was "both customarily and actually treated as private" by the University of Pittsburgh because four categories of withheld information—Categories Two, Three, Four, and Five, have been made public.  Pl.'s Opp'n at 9–12; Pl.'s Reply at 2–7.[12]  Under what has been termed the "public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record."  *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999); *see also Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) ("[T]he government cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'" (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130–34 (D.C. Cir. 1983))).  This exception is narrow and, if applicable, requires the information requested to (1) "be as specific as the information previously released[,]" (2) "match the information previously disclosed[,]" and (3) "already have been made public through an official and documented disclosure."  *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 765 (D.C. Cir. 1990) (citing

---

[12]    Plaintiff raised no argument disputing whether commercial information contained in Category Six—the letters of support—was confidential, *see* Pl.'s Opp'n at 11–12, and, consequently, this argument is deemed conceded.

*Afshar*, 702 F.2d at 1133).  Furthermore, the party "who asserts that material is publicly available carries the burden of *production* on that issue." *Davis*, 968 F.2d at 1279 (emphasis in original); *see also Afshar*, 702 F.2d at 1130 ("[A] plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.").  Each of plaintiff's public disclosure claims is addressed in turn.

First, plaintiff claims that Category Two information as to the number of tissue disbursements made and shipped, is publicly available information revealed on the "Abstract" portion of the University of Pittsburgh's webpage for the original 2016 grant application.  Pl.'s Opp'n at 11.  Defendant concedes that the total number of disbursements made in the calendar year referenced in the Abstract was publicly available and released the information in the revised production sent to plaintiff on February 21, 2022.  Def.'s Opp'n at 4–5.  According to defendant, however, the number of tissue samples disbursed to an individual investigator per year is not publicly available and is thus being withheld as confidential information.  *Id*. at 5, *see also* Second NIH Decl. ¶ 9.  Plaintiff offered no response to that argument.  Accordingly, plaintiff has not sustained its burden of showing that the remaining withholdings of Category Two information consisting of the number of tissue samples disbursed to an individual investigator per year is publicly available information.

Second, plaintiff contends that Category Three information as to the names of at least three tissue procurement sites are publicly available information: UPMC Magee-Womens Hospital, UPMC Shadyside, and Children's Hospital of UMPC.  Pl.'s Opp'n at 11–12; Pl.'s Reply at 2–3, 7.  Defendant concedes that the University of Pittsburgh publicly disclosed UPMC Magee-Womens Hospital as a tissue procurement site for the university and thus removed all redactions of that name in its February 21, 2022 revised production.  *See* Second NIH Decl. ¶ 6.

20

Defendant also concedes that the other two performance sites named by plaintiff were redacted "inconsistently" and thus defendant "inadvertently releas[ed] information it believed to be exempt from disclosure inadvertently compromising the confidentiality of that information." Third NIH Decl. ¶ 11.  Defendant also acknowledged that the name of another performance site, UMPC Presbyterian, was inadvertently disclosed due to inconsistent redactions.  Revised *Vaughn* Index at 60.  Consequently, defendant released all four names in its revised production on August 26, 2022, rendering any dispute as to these names moot.  *See* Revised *Vaughn* Index at 57–62, 83–85, 90–91.  Nonetheless, defendant argues that plaintiff has not established that the locations within these performance sites "where tissue is collected and processed, and other sites where tissues are processed" is public information.  Def.'s Opp'n at 5.  Plaintiff has not offered any evidence demonstrating that these remaining locations under Category Three are in the public domain and therefore fails to sustain its burden.

Third, plaintiff contends that *all* of the Category Four information pertaining to costs associated with the grant are public information, either through publication on the university's webpage, Pl.'s Opp'n at 12, or through disclosure in other parts of the produced records, Pl.'s Reply at 3.  As to the "costs" listed on the university's webpage, defendant explains that the information plaintiff cites is actually a price list for specific services *offered* by the university and not a breakdown of costs *incurred* by the university in collecting and processing tissue.  Second NIH Decl. ¶ 10.  Thus, plaintiff has failed, in this instance, to identify that the costs information specifically requested matches the information disclosed.  On the other hand, defendant concedes that NIH inadvertently and inconsistently released some cost information in prior productions, compromising the confidentiality of cost information that the University of Pittsburgh specifically identified as confidential commercial information.  Third NIH Decl. ¶ 10.

21

Defendant released the inadvertently disclosed cost information in its August 26, 2022 revised production, rendering any challenges to withholding this specific information moot.  *See id.*; *see also* Revised *Vaughn* Index at 16, 33–34, 49.  Plaintiff has failed to put forth any evidence showing that the remaining cost information withheld under Category Four is in the public domain.

Fourth, plaintiff contends that the Category Five information regarding the anticipated number of tissue collections per year is publicly available because it is either released on the University of Pittsburgh's public webpage, Pl.'s Opp'n at 11, or as information required by law to be reported and publicly released, Pl.'s Reply at 5.  Defendant concedes that the total number of cases, i.e., abortions from which tissue could be collected, referenced in the Abstract for the university's grant is publicly available information and released such information in its February 21, 2022 revised production, rendering any withholding as to that specific information moot. Def.'s Opp'n at 4–5.

Plaintiff, however, has failed to meet its burden of showing that the average number of abortions performed and the breakdown of the number of abortions done at Magee-Womens Hospital is publicly available information.  *See* Pl.'s Reply at 5.  Plaintiff contends that this information must be publicly reported under 18 Pa Stat. and Cons. Stat. Ann. § 3214(f), which provides that each facility must report quarterly "the total number of abortions performed within the hospital," including the total number of abortions performed in each trimester, but such reports are made publicly available "only if the facility receives State-appropriated funds within the 12-calendar-month period immediately preceding the filing of the report." 18 Pa Stat. and Cons. Stat. Ann. § 3214(f).  Otherwise, the State of Pennsylvania "shall regard [a facility's] report as confidential."  *Id*.  Plaintiff submitted as an exhibit the Magee-Womens

Hospital quarterly report for January through March of 2015, indicating that the hospital did in fact receive state funds for the prior year.  Pl.'s Reply, Second Decl. of Meredith di Liberto, Ex. 7, ECF No. 22-1.  Plaintiff, however, has not demonstrated that the exhibit covers the specific information withheld by defendant.  Defendant clarifies that the withheld information is "not part of quarterly filings to the State," but in fact "represents calculated numbers covering an unknown number of years generated by the university, and inextricably intertwines in the data . . . a category of information that is discussed in the statute."  Third NIH Decl. ¶ 12.  As plaintiff has not demonstrated that Magee-Womens Hospital has submitted a publicly available report for each year covered by the withheld information, plaintiff has not met its burden of "pointing to specific information in the public domain that appears to duplicate that being withheld."  *Afshar*, 702 F.2d at 1130.

Excepting the concessions just discussed, defendant has sufficiently shown that the University of Pittsburgh customarily and actually treated the provided information as private.  To establish provider custom for purposes of Exemption 4, an agency may rely on sworn affidavits, made on personal knowledge.  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 110.  Personal knowledge of a provider's custom may be demonstrated in various ways, "including by relaying that the submitters themselves told the agency that the information is confidential, by indicating that the agency reached an understanding with the submitters that the information would be held in confidence by the [government] and not publicly divulged, by pointing to confidential markings on the documents themselves or to the existence of a non-disclosure agreement, or by providing descriptions of the documents that demonstrate their confidential nature."  *Id.* at 110–11 (cleaned up).  Conclusory statements, however, by an agency official about what the agency

official may believe about how a submitter customarily treats the information at issue are simply insufficient.

Here, the agency provided declarations based on personal knowledge as well as a declaration from the University of Pittsburgh to establish that all categories of withheld information under Exemption 4 are customarily and actually treated by the university as confidential information.  The Vice-Chancellor of the University's Office of Research Protections, affirmed that "[i]t is a common practice at Pitt to seek redactions on grant applications to the NIH . . . where they contain . . . private or closely-held information about a project that may reveal . . . such commercial information related to costs, supplies, amounts of materials, research methods, etc."  Def.'s Mem., Ex. E, Decl. of Bill Yates, Vice-Chancellor, University of Pittsburgh, Office of Research Protections, ("Yates Decl.") ¶ 7, ECF No. 17-3.  Mr. Yates further clarified that "the terms of Pitt's grant for the procurement of tissue is closely held confidential information by [its] researchers on the grant and Pitt personnel who manage the NIH grant.  Such information, including salary information, costs to administer the grant, number of tissue collections, and the location and size of its procurement sites, is not distributed to other individuals working or studying at the University or to the public generally."  Id. ¶ 8.  NIH's declaration also attests that the University of Pittsburgh conveyed to the agency "that the withheld information is . . . confidential in nature [and] . . . is always kept confidential."  First NIH Decl. ¶ 25; see also id. ¶¶ 26–28.  These declarations provide a firm foundation for establishing defendant's confidentiality claim.

Plaintiff attacks the sufficiency of these declaration by pointing out that certain information in the withheld categories was not actually treated as confidential but was instead publicly available information.  Pl.'s Opp'n at 11–12; Pl.'s Reply at 6–7.  With the exception of

the naming of Magee-Womens Hospital and the publication of the total number of tissues collected and disbursed mentioned in the Abstract, plaintiff has failed to show that the majority of withheld information is not customarily and actually treated as private.  Although defendant did release several other types of information within the withheld categories, those releases were due to inadvertent disclosures and certainly did not reflect the University of Pittsburgh's stance on how the information is typically and actually treated by the university.  *See, e.g.*, Third NIH Decl. ¶¶ 10–11 (noting that it was NIH that "inadvertently releas[ed] information it believed to be exempt from disclosure" and that "[t]he University of Pittsburgh should not be punished for NIH's error").

Plaintiff also questions how locations within the disclosed performance sites could be confidential if the sites themselves are disclosed.  Pl.'s Reply at 7.  The question is a nonstarter.  Clearly the names of specific locations associated with human tissue processing within a large hospital may not be public information, and plaintiff has not pointed to any information showing otherwise.  Thus, defendant has satisfactorily established that, outside of the conceded exceptions, the information withheld under Categories Two, Three, Four, and Five, is customarily and actually treated as private.

### b.  Assurances of Privacy

Plaintiff does not contest, and defendant's declarations confirm, that the withheld categories of information were submitted under an assurance of privacy and thus that this requirement is also satisfied.  The agency declaration makes clear that the categories of information withheld under Exemption 4 in this matter "[are] routinely withheld at NIH and other agencies when releasing grant information under the FOIA precisely in recognition of the commercial sensitivity of the information."  First NIH Decl. ¶¶ 26–27.  Mr. Yates confirmed that he has a longstanding understanding of NIH's practices in regard to grant applications and FOIA

requests, noting both the common practices of the university when submitting redaction requests

to NIH as well as the university's reliance on NIH's standard redactions.  *See* Yates Decl. ¶¶ 4,

6–7, 12.  These supporting declarations of NIH and Mr. Yates reveal "implied" assurances of

privacy "based on context and the history of [NIH] and [the University of Pittsburgh]'s

relationship."  *Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, No. CV 19-3749 (CKK),

2021 WL 4206594, at *8 (D.D.C. Sept. 16, 2021); *see also Besson v. U.S. Dep't of Com.*, 480 F.

Supp. 3d. 105, 115 (D.D.C. 2020) (finding that information was supplied to an agency based on

an implied assurance of confidentiality).  Accordingly, defendant has demonstrated that the

categories of information withheld under Exemption 4, barring conceded exceptions, constitute

"confidential" information.

### 3.  *Sufficiency of Showing that Disclosure of the Withheld Information Would Cause Foreseeable Harm*

The FOIA Improvement Act provides that "[a]n agency shall withhold information . . .

only if the agency reasonably foresees that disclosure would harm an interest protected by" one

of the nine FOIA exemptions.  5 U.S.C. § 552(a)(8)(A)(i)(I).  This provision requires agencies

withholding information under an exemption to show not only that a withheld record "falls

within a FOIA exemption," but also "that the agency 'reasonably foresees that disclosure would

harm an interest protected by [the] exemption.'"  *Machado Amadis v. U.S. Dep't of State*, 971

F.3d 364, 370 (D.C. Cir. 2020) (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).  At

this stage, defendant has established that Categories Two, Three, Four, Five, and Six, barring the

previously discussed conceded disclosures, constitute confidential, commercial information that

falls within the scope of Exemption 4.  Plaintiff contends that defendant has failed to meet its

burden as to all five categories.  Pl.'s Opp'n at 12–14; Pl.'s Reply at 7–8.

To satisfy the foreseeable harm requirement, defendant must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing "genuine harm to [its] owner's economic or business interests," *Food Mktg. Inst.*, 139 S. Ct. at 2369 (Breyer, J., concurring in part), and thereby dissuading others from submitting similar information to the government, *see Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974), *abrogated by Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) (explaining that Exemption 4 "'is intended to encourage individuals to provide certain kinds of confidential information to the Government,'" and to "protect[ ] persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication" (quoting *Soucie v. David*, 448 F.2d 1067, 1078 (D.C. Cir. 1971))).  Agencies therefore "must provide more than 'nearly identical boilerplate statements' and 'generic and nebulous articulations of harm.'"  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (quoting *Jud. Watch v. U.S. Dep't of Just.*, No. CV 17-0832 (CKK), 2019 WL 4644029, at *4–5 (D.D.C. Sept. 24, 2019)).

Contrary to plaintiff's claims that defendant's specified harms are "too tenuous and broad" or "generic," Pl.'s Opp'n at 13–14, for each category of information, the agency's declarations have "directly articulated '[a] link between the specified harm and the specific information contained in the material withheld.'"  *WP Co. v. U.S. Small Bus. Admin.*, No. 20-1240, 2021 WL 5881972, at *4 (D.D.C. Dec. 13, 2021) (alteration in original) (quoting *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 371 (D.C. Cir. 2021)).  In particular, NIH's declaration explains that disclosure of the withheld information in Categories Two, Three, Four, and Five would put the University of Pittsburgh at competitive disadvantage

because release of the information at issue "is equivalent to releasing line-item pricing information for individual services, and provides the competition with the precise figure it needs to undercut the University of Pittsburgh in future grant requests for similar services."  First NIH Decl. ¶ 27.  Similarly, the disclosure of information in Category Six would foreseeably cause competitive harm "because competitors could attempt to underbid the University of Pittsburgh for its clients," which would clearly affect its profit margins.  *Id.* ¶ 28.  Such assertions sufficiently describe how disclosing the withheld information would cause "genuine harm to [the submitter's] economic or business interests."  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113 (alteration in original) (quoting *Food Mktg.*, 139 S. Ct. at 2369 (Breyer, J., concurring in part)).[13]

In sum, for the Exemption 4 withholdings in Categories Two, Three, Four, Five, and Six not already denied as moot due to the release by defendant, *see* Revised *Vaughn* Index at 16, 33–34, 49, 57–62, 83–85, 90–91, defendant has established all three elements of Exemption 4.  The Court grants summary judgment to defendant as to these withholdings and denies summary judgment to plaintiff.  The Court also grants summary judgment as conceded to defendant as to Category One.  Pl.'s Opp'n at 7.  As explained *supra* in Section III.A.2.a, summary judgment as to all the Exemption 4 withholdings released by defendant in its revised productions are denied as moot.  *See generally* Revised *Vaughn* Index.  Summary judgment as to all other Exemption 4 withholdings is denied to both parties without prejudice.

### B.      Withholdings Under FOIA Exemption 6

Under Exemption 6, plaintiff challenges defendant's withholding of only three categories of information: Category Three regarding the names, job titles, location of tissue procurement

---

[13]      Plaintiff's argument that the disclosure of client identities under Category Six could be resolved simply through the redaction of client names and not by withholding the letters in full, Pl.'s Opp'n at 13, is a segregability argument that will be addressed *infra* in Section III.C.

sites, and other identifying information of University of Pittsburgh employees involved in administering the grant, with the exception of the name of the principal investigator; Category Five regarding names and identifying information of third parties supporting the grant; and Category Six regarding identifying information in letters of support submitted with University of Pittsburgh's grant application.  Pl.'s Opp'n at 15.[14]

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal."  *Milton v. U.S. Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc)).  Once this threshold determination is met, the Court next inquires whether disclosure "'would compromise a substantial, as opposed to *de minimis,* privacy interest,' because '[i]f no significant privacy interest is implicated . . . FOIA demands disclosure.'"  *Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (alteration and omission in original) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)).  The standard "means less than it might seem," as a substantial privacy interest is "anything greater than a *de minimis* privacy interest."  *Id.* at 1229–30.  If there is a substantial privacy interest in the information, courts employ a balancing test to determine whether release of such information constitutes a clearly unwarranted invasion of personal privacy, *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982); *Rose*, 425 U.S. at 372, by weighing "the privacy interest that would be compromised by disclosure against any

---

[14]     Accordingly, the Court grants summary judgment as conceded to defendant for the remaining categories— Categories One, Two, and Four.

public interest in the requested information." *Multi Ag Media LLC*, 515 F.3d at 1228. "[A]

privacy interest may be substantial," yet nonetheless "be insufficient to overcome the public

interest in disclosure." *Id.* at 1230. "Exemption 6's requirement that disclosure be 'clearly

unwarranted' instructs us to 'tilt the balance (of disclosure interests against privacy interests) in

favor of disclosure.'" *Morley v. C.I.A.*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting *Wash.*

*Post Co.*, 690 F.2d at 261).

As a threshold matter, the Court must determine whether the withheld information

constitutes "similar files" to "personnel and medical files" that are subject to Exemption 6.  5

U.S.C. § 552(b)(6).  "The terms [sic] 'similar files' is construed broadly and 'is intended to cover

detailed Government records on an individual which can be identified as applying to that

individual.'" *Gov't Accountability Project*, 699 F. Supp. 2d 97, 105–06 (D.D.C. 2010)

(quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982)).  "[C]ourts look 'not to

the nature of the files,' but rather to 'the nature of the information' at issue." *Skybridge*

*Spectrum Found. v. F.C.C.*, 842 F. Supp. 2d 65, 83 (D.D.C. 2012) (quoting *N.Y. Times*, 920 F.2d

at 1006); *see also Jud. Watch*, 449 F.3d at 152–53 ("similar files" encompasses "not just files,

but also bits of personal information, such as names and addresses, the release of which would

'create[ ] a palpable threat to privacy.'" (alteration in original) (quoting *Carter v. U.S. Dep't of*

*Com.*, 830 F.2d 388, 391 (D.C. Cir. 1987))).  Plaintiff does not dispute that the requested

information are "similar file[s]," *see* Pl.'s Opp'n at 15; Def's Opp'n at 8, and because the names,

job titles, location of tissue procurement sites, and other identifying information of University of

Pittsburgh employees, names and identifying information of third parties supporting the grant,

and names and identifying information of clients who wrote letters in support of the grant are

"bits of personal information," *Jud. Watch*, 449 F.3d at 152, that "appl[y] to . . . particular

individual[s]," *Wash. Post Co.*, 690 F.2d at 260, Exemption 6 may be triggered.  *See Jud. Watch*, 449 F.3d at 152–53 (finding that the names and addresses of persons and businesses associated with a drug that induced abortion constituted "similar files").  Accordingly, the appropriateness of the Exemption 6 withholdings turns on whether the requested information implicates a substantial privacy interest and, if so, whether release of the information would be "clearly unwarranted" in view of the public interest, if any, in the requested documents.

### 1.    *Privacy Interests*

In construing Exemption 6, the D.C. Circuit has repeatedly found a substantial privacy interest in personal information that could subject individuals to "injury and embarrassment." *Id.* at 153; *see Nat'l Ass'n of Retired Fed. Employees*, 879 F.2d at 875–78 (explaining that "Exemption 6 is designed to protect personal information" that is "embarrassing or of an intimate nature" or could "occasion significant annoyance," or exposure to unwanted solicitation or harassment); *see also Jud. Watch, Inc., v. U.S. Dep't of State*, 875 F. Supp. 2d 37, 46 (D.D.C. 2012) (recognizing that "[a] substantial privacy interest exists in avoiding embarrassment, retaliation, or harassment and intense scrutiny by the media that would likely follow disclosure." (citing *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 n.12 (1991); and *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 167 (2004))).  "[T]he disclosure of names is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue." *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at 877. A threat of harassment is more than *de minimis*, and therefore substantial, if the "risk" of harassment is both "justified and articulable." *Jud. Watch*, 875 F. Supp. 2d at 47 (citing *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 118 (D.D.C. 2005) (withholding of employee names upheld where media scrutiny and harassment were likely)).

Defendant asserts that the University of Pittsburgh's employees, third-party supporters, and clients who wrote letters in support of the university receiving NIH's grant maintain a substantial privacy interest in nondisclosure of their names and identities due to the danger of fetal tissue-related violence and harassment.  Def.'s Mem. at 10.  Defendant supports this assertion by claiming that researchers "involved in sensitive research like . . . fetal tissue research," have been subject to "ongoing, unrelenting harassment" in the past.  First NIH Decl. ¶ 31.  The agency's declarant also described how fellow colleagues at NIH "have received threats of violence to their person on issues generating similar passions as those relating to fetal tissue," and discussed the news reports detailing "violence (including murders) committed against medical staff who work with fetal tissue."  Second NIH Decl. ¶ 12.  The Revised *Vaughn* Index explains further that identifying the location where this sensitive research takes place "could assist in identifying the individuals participating in the project" and "it would identify a location where they could be found and open them to harassment or physical violence at their workplace."  *See, e.g.*, Revised *Vaughn* Index at 59–60.

Based on these declarations, defendant has fairly asserted fetal tissue-related violence and harassment as a privacy interest for the names, addresses, titles, and other identifying information for persons and locations associated with fetal tissue research.  *See Jud. Watch*, 449 F.3d at 153 (holding that declarations which detailed evidence of abortion-related violence were sufficient to establish a substantial privacy interest for persons and businesses associated with a drug that induced abortions).  Moreover, the parties agree that intense public scrutiny already surrounds the university's procurement of fetal tissue.  *See* Def.'s Opp'n at 9; Pl.'s Opp'n at 19.  Accordingly, the record establishes a clear risk that disclosure of the withheld information would likely subject persons associated with fetal tissue procurement and research to targeting,

harassment, and potentially violence.  *See Stotter v. U.S. Agency for Int'l Dev.*, No. 14-CV-2156 (KBJ), 2020 WL 5878033, at *7 (D.D.C. Oct. 3, 2020) (finding same when individuals worked in a sensitive geopolitical region); *Jud. Watch*, 875 F. Supp. 2d at 47–48 (finding same where intense public scrutiny of the project at issue already existed); *see also Humane Soc'y of the U.S. v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 45 (D.D.C. 2019) ("The D.C. Circuit 'has been particularly concerned when the information *may* be used for solicitation purposes' or 'invite[] unwanted intrusions.'" (emphasis added) (alteration in original) (quoting *Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999))).

Plaintiff asserts that this stated privacy interest is *de minimis* for two reasons.  First, plaintiff claims that the public availability of the principal investigator's name and the names of other individuals associated with the University of Pittsburgh's Biospecimen Core[15] shows that the university does not have a real fear of harassment because the identities of those most closely tied to the research are published.  Pl.'s Opp'n at 16–18.  This contention, however, is without merit.  This rationale contradicts this Circuit's holding in *Judicial Watch*, where the D.C. Circuit held that once an agency established the potential for violence and harassment for persons or businesses associated with the product at issue, such "privacy interest extends to all such employees, and the [agency] need not 'justify the withholding of [names] on an individual-by-individual basis under FOIA Exemption 6."  449 F.3d at 153 (second alteration in original) (quoting *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994)).  Although defendant has released the name of the principal investigator and related identifying information, *see* Def.'s Opp'n at 11; Third NIH Decl. ¶¶ 19–20, such release has no bearing on the privacy interests of the employees and other third parties the university continues to protect.  Moreover, as defendant

---

[15]     The University of Pittsburgh's Health Sciences Tissue Bank is now known as the Pitt Biospecimen Core. 2nd NIH Decl. ¶ 9.

explained in its supplement to the record, although the university's website does publish the names of individuals associated with the Biospecimen Core, it does not identify which individuals work on fetal tissue.  Third NIH Decl. ¶ 15.  Accordingly, the publication of employees' names does not lead to the invasion of the privacy interest at issue because it is not apparent which employees are involved with fetal tissue research.

Second, plaintiff argues that the locations of tissue procurement sites have been publicly acknowledged and thus disclosure of the location information cannot result in the invasion of a substantial privacy interest.  Pl.'s Opp'n at 17.  As with Exemption 4, defendant has released the names of several locations where fetal tissue is procured or processed for the grant that were withheld pursuant to Exemption 6.  *See* Revised *Vaughn* Index at 12, 15–16, 30, 33, 45–46, 48, 57–62, 84, 91.  Accordingly, these withholdings are no longer at issue and summary judgment as to them is denied as moot.  Nonetheless, the release of these general locations does not remove the potential for harm that could result if harassers or those with violence on their minds learned the specific locations within the hospitals where individuals worked on fetal tissue research, procurement, or processing.  Disclosure of such information would in fact increase the likelihood of danger and harm the individual employees and others on site might face.[16]

Thus, defendant has established a substantial privacy interest in the withheld information due to the justified and articulable risk of harassment and violence that University of Pittsburgh employees, third-party supporters, and clients face due to their association with fetal tissue research and procurement.

---

[16]     Defendant also concedes that the University of Pittsburgh's address was inconsistently redacted in withholdings under Exemption 6.  Third NIH Decl. ¶ 23.  Defendant's revised production on August 26, 2022, released this information to plaintiff, rendering any challenge to its withholding moot. *See id.*; Revised *Vaughn* Index at 2, 5, 18, 22, 36, 51, 55.

### 2.    *The Private Interest Outweighs any Public Interest in Disclosure*

The privacy interests of the records at issue must be balanced against any public interest in disclosure.  The "basic purpose of [FOIA] . . . focuses on the citizens' right to be informed about 'what their government is up to,'" and so "information that 'sheds light on an agency's performance of its statutory duties' is in the public interest."  *Multi Ag Media*, 515 F.3d at 1231 (alteration and omission in original) (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)).  Consequently, "a significant public interest in disclosure" exists for records that "will enable the public to more easily monitor whether [an] agency is carrying out its statutory duty."  *Id.* at 1232.

Plaintiff contends that the withheld information "sheds light on how [NIH] spends taxpayer money, with whom [NIH] partners in research involving fetal tissue, how the research is performed, and whether federal and state laws have been followed."  Pl.'s Opp'n at 19.  As defendant aptly points out, plaintiff has failed to show how the withheld information under Categories Three, Five, and Six affects those interests.  Defendant has already released the grant application, shedding light on how NIH spends taxpayer money and with whom NIH partners for research involving fetal tissue, as well as whether federal or state laws are being followed. Defendant has also released the identity of the key University of Pittsburgh personnel involved in administering the grant, i.e., the principal investigator.  *See Glossary: Principal Investigator*, NAT'L INSTS. HEALTH, https://registries.ncats.nih.gov/glossary/principal-investigator/ (last visited Sept. 1, 2022) ("Principal investigator (PI) refers to the person(s) in charge of a clinical trial or a scientific research grant . . . . A PI is primarily responsible for the preparation, conduct, and administration of a research grant, cooperative agreement, or other sponsored project in compliance with applicable laws and regulations and institutional policy governing the conduct of clinical research.").  Plaintiff does not articulate how the release of any of the disputed

categories of information, which involve non-agency third parties, will shed light on how the agency operates in ways that has not already been disclosed by the released information.  *See Stotter*, 2020 WL 5878033, at *8 (finding a minimal public interest in identifying information regarding agency-affiliated grantees and their employees when "the unredacted information that [the agency] has released already details the agency's operations and activities that involv[ed] the grant's purpose").

Moreover, this Circuit has long recognized that Exemption 6 "provides greater protection to private individuals, including applicants for federal grants and officials of regulated private companies, and to low-level government employees, than to government officials with executive responsibilities."  *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 938 (D.C. Cir. 1982).  In light of the strong privacy interests the affected individuals have in "avoiding physical danger" and harassment, *see Jud. Watch*, 449 F.3d at 153, such interests clearly outweigh the minimal public benefit, if any, that can be gained from revealing their identities.  *See Stotter*, 2020 WL 5878033, at *7–8 (finding that the strong privacy interest in the identifying information of "contractor, grantee, and sub-grantee staff and beneficiaries, and related information that could be used to identify them, such as the name of a group with whom they were affiliated, or its location," due to the security risk posed by disclosure outweighed any public interest in the disclosure of such information because such disclosure would only provide a small value in shedding light on the agency's operations and activities); *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 76–77 (D.D.C. 2007) (finding the same where the interest at issue was avoiding harm to life or liberty); *In Def. of Animals v. Dep't of Health & Hum. Servs.*, No. CIV 99-3024 (TFH), 2001 WL 34871354, at *7 (D.D.C. Sept. 28, 2001) (finding the same when risk of significant threats and harassment was the privacy interest

involved).  Thus, the Court grants summary judgment to defendant as to Categories Three, Five, and Six.[17]

### C.  Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure.  5 U.S.C. § 552(b).  Producing segregable information is essential for an agency's FOIA compliance, and "district courts cannot approve withholding exempt documents 'without making an express finding on segregability.'"  *Machado Amadis*, 971 F.3d at 371 (quoting *Morley v. CIA*, 508 F.3d at 1123); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.").

In evaluating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman*, 494 F.3d at 1117.  Even under that presumption, "the agency must provide a 'detailed justification' for [the exempt material's] non-segregability," but need not "provide so much detail that the exempt material would be effectively disclosed."  *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Ctr., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)).  Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which

---

[17]   A review of the Revised *Vaughn* Index, however, revealed one category of information withheld under Exemption 6 that was not covered in defendant's briefing or declarations: "Name of NIH staff involved in administering the grant."  Revised *Vaughn* Index at 2–4, 14, 19, 21, 31, 36–39, 52–53, 71, 73, 75, 78, 80; *see also* Second NIH Decl. ¶ 13 ("The information that NIH withheld [under Exemption 6] is only limited to detailing the Pittsburgh employees who worked on the project for which the grant funds were awarded, who provided letters of support for Pittsburgh to receive the grant, and information that would compromise the identity of those individuals.").  The record is unclear, however, whether this is a disputed category or whether the NIH staff involved constitute key agency personnel, and thus the Court is unable to determine at this time, whether the information was properly withheld under Exemption Six.  Accordingly, summary judgment is denied without prejudice as to this category of information.

could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice.  *Id.*; *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are sufficient for the segregability determination).

To this end, defendant attested initially that it "conducted a line-by-line review of the records at issue in this case," First NIH Decl. ¶ 16, and "determined that the 39 pages it withheld in full could not be segregated for release," *id.*¶ 33.  Nevertheless, over the course of briefing on the instant motions, defendant continued to review the challenged records for segregability, revising its segregability determinations and releasing to plaintiff new copies of challenged records with fewer redactions in several instances, including after filing its motion for summary judgment, Pl.'s SMF ¶ 63, after plaintiff filed its cross-motion for summary judgment, Second NIH Decl. ¶¶ 5–6, 15–16, and after plaintiff filed its reply in support of its cross-motion for summary judgment, Third NIH Decl. ¶ 27.

Defendant has provided plaintiff with multiple *Vaughn* indices of the challenged records, listing the justification for withholding information as well as explaining why previously withheld information was subsequently released.  *See generally* Revised *Vaughn* Index. Ultimately, after all of these revisions, defendant continues to maintain that the Biographical Sketch "could [not] be released without compromising the identify of a staff member" protected under Exemption 6, and the letters of support still remain largely redacted because they contain information "protected by Exemptions 4 and 6, and that protected information [is] so intertwined with non-exempt information that NIH could not reasonably segregate any portion of those

documents for release."  Second NIH Decl. ¶¶ 15–16; *see also* Revised *Vaughn* Index at 9, 91–92.

Plaintiff challenges the sufficiency of these attestations on two grounds.  First, plaintiff contends that defendant's multiple revisions and release of documents previously held in full "demonstrate[] how much non-exempt information was previously withheld that could have been segregated and released in the initial production."  Pl.'s Opp'n at 20; *see also* Pl.'s Reply at 11–12.  An agency's revision of its previous segregability determination does not, as plaintiff suggests, raise an inference that the agency has failed to comply with its obligation to release all reasonably segregable, non-exempt information.  To the contrary, supplemental releases of information "evidence[ ] a good-faith effort on the [agency's] part to segregate nonexempt information where possible."  *Schoenman v. FBI*, 575 F. Supp. 2d 136, 161 (D.D.C. 2008).  Nor does NIH's revisiting of its earlier determination rebut the presumption that the agency has fulfilled its segregability obligations.  *See Sussman*, 494 F.3d at 1117.

Second, plaintiff disputes defendant's claim that the letters of support contain "information protected by Exemptions 4 and 6 and is so intertwined with non-exempt information that NIH could not reasonably segregate any portion" due to the fact that at least some Exemption 4 withholdings have now been removed.  Pl.'s Reply at 12 (quoting First NIH Decl. ¶ 33); *see also id.* at 6 n.7.  The Revised *Vaughn* Index does reveal that, despite defendant's claims in its briefing and declarations, only Exemption 6 is listed as the justification for withholding the letters of support, which is inconsistent with the arguments in defendant's briefing and declarations that the letters also contain information withheld pursuant to Exemption 4.  *See supra* Section III.A.1.b.  This inconsistency might be cause for concern but for the fact that the agency has consistently maintained its position that the information protected by

Exemptions 4 and 6 "is so intertwined with non-exempt information that NIH could not reasonably segregate any portion of those documents to provide any meaningful information," even after releasing the publicly available information concerning procurement sites under Exemption 4, First NIH Decl. ¶ 33; Second NIH Decl. ¶¶ 6, 15–16 ("[C]ertain pages still remain in large part redacted simply because they contain identifying information of third parties . . . ."). Further, the agency has sustained its burden of demonstrating that the categories of information contained in the letters—Category Six for Exemption 4 and Category Six for Exemption 6— were appropriately withheld.  Thus, the agency's statement that any disclosure of non-exempt, segregable information would not result in the release of any meaningful information, First NIH Decl. ¶ 33, suffices to show that the withheld information could not be further segregated.  *See Cause of Action Inst. v. U.S. Dep't of Com.*, 513 F. Supp. 3d 116, 132 (D.D.C. 2021) (finding an agency's declaration that release of non-exempt information "would have resulted in disclosure of 'a meaningless set of words or phrases which have no or minimal information content'" sufficient).  The burden then shifts to plaintiff to "produce a 'quantum of evidence' to rebut th[e] presumption."  *Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 330 F. Supp. 3d 293, 306 (D.D.C. 2018) (quoting *Sussman*, 494 F.3d at 1117).  Plaintiff offers nothing beyond speculation that might rebut the presumption.  Defendant has thus demonstrated compliance with its segregability obligations, and the disputed records are properly withheld.

### D.     Bad Faith

Finally, plaintiff contends that summary judgment should be denied to defendant due to the agency's bad faith in processing the initial request, Pl.'s Opp'n at 21, the handling of revised productions, *id.* at 22, and inconsistencies in the agency declarations, *id.* at 21–22; Pl.'s Reply at 13–14, such that the presumption of accuracy generally given to agency declarations is not warranted here.

As already noted, *supra* in Part II, summary judgment in FOIA cases is appropriate on the basis of agency affidavits absent "evidence of agency bad faith." *Aguiar*, 865 F.3d at 734–35. "[U]ntil evidence appears to the contrary, agencies are entitled to a presumption of administrative regularity and good faith." *Fed. Trade Comm'n v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C. Cir. 1980); *see also Ass'n of Nat'l Advertisers, Inc. v. Fed. Trade Comm'n*, 627 F.2d 1151, 1171 (D.C. Cir. 1979) (requiring "a clear and convincing showing . . . to rebut the presumption of administrative regularity"). When considering whether an agency declaration was made in bad faith, "[t]he sufficiency of the affidavit[ ] is not undermined by a mere allegation of agency misrepresentation or bad faith, nor by past agency misconduct in other unrelated cases." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). Furthermore, "[t]he only situation in which the Court would withhold a presumption of good faith as to a sworn agency declaration is if the plaintiffs were able to present contrary evidence of *bad faith*." *Mobley v. Cent. Intel. Agency*, 924 F. Supp. 2d 24, 63 (D.D.C. 2013) (emphasis in original) (finding that "inconsistency in [an agency] declaration [was] not evidence of bad faith").

Here, none of plaintiff's assertions warrant a finding of bad faith on the part of defendant. First, plaintiff argues that NIH's initial handling of plaintiff's request suggests bad faith because the initial processing officer "demand[ed] that Plaintiff exclude information" before she would process the request and made representations about redactions that turned out not to be the case. Pl.'s Opp'n at 21. This argument is a nonstarter because plaintiff's FOIA request was ultimately processed without any information excluded from the search and the initial processing officer merely explained that her request for plaintiff to exclude certain information from its FOIA

request would expedite, not foreclose, processing, and that she did not have the power to make any final release determinations.  *See* Pl.'s Opp'n, Ex. 1 at 3, 5, ECF No. 19-2.

Second, plaintiff points to several alleged inconsistencies in the agency's declarations, none of which rise to level of bad faith.  *See Mobley*, 924 F. Supp. 2d at 63 (finding errors or inconsistencies do not constitute evidence of bad faith unless they have a significant impact on the litigation).  While the agency's declarant made the erroneous statement initially that the requested records "do not involve the provision of fetal tissue," First NIH Decl. ¶ 31, this statement was quickly corrected in the subsequent declaration, Second NIH Decl. ¶ 4.  Several of the inconsistencies raised by plaintiff came about because plaintiff ultimately demonstrated that information was in the public domain.  "The fact that certain withheld information exists in the public domain does not suggest bad faith on the part of an agency because an agency is not obligated to 'prov[e] the negative—that the information has *not* been revealed.'"  *Nat'l Sec. Couns. v. C.I.A.*, 960 F. Supp. 2d 101, 197 (D.D.C. 2013) (emphasis in original) (quoting *Davis*, 968 F.2d at 1279).  Furthermore, the agency does not bear the burden of performing an exhaustive search of publicly available records or of demonstrating that information found to be publicly available in one case should also be released in another.  *Davis*, 968 F.2d at 1279.  The requester bears the burden of "point[ing] to specific information in the public domain" that is "identical to that being withheld."  *Id.* at 1280.  Although defendant's briefing and redactions have certainly revealed some inadvertent releases and inconsistent redactions, the overall comprehensiveness of its declarations and *Vaughn* indices defeat any assertion of bad faith.  *See Bowen v. U.S. Food and Drug. Admin*, 925 F.2d 1225, 1227 (9th Cir. 1991) (noting that defendant's submission of affidavits from "responsible and qualified agency officials, along with

accompanying exhibits," and a *Vaughn* index, provided the district court with a comprehensive analysis of plaintiff's requests and defendant's withholdings, defeating any bad faith assertions).

Third, plaintiff points to the fact that although defendant's motion for summary judgment and accompany declaration claimed that the principal investigator's name was no longer withheld, at the time of filing, the revised production had not been produced, and defendant did not inform plaintiff when a revised production would be forthcoming.  Pl.'s Opp'n at 22; Pl.'s Reply at 12–13.  While defendant could have been more diligent and forthcoming, the revised production sent to plaintiff after the filing of defendant's motion for summary judgment did in fact release the principal investigator's name.  In short, although defendant's execution of its duties under FOIA was not perfect, "error-free performance is not required." *Fischer v. U.S. Dep't Just.*, 723 F. Supp. 2d 104, 109 (D.D.C. 2010).  Altogether, the Court is satisfied that no sufficient reason has been presented to revoke the presumption of good faith and substantial deference generally accorded to sworn agency affidavits in FOIA cases.

## IV.    CONCLUSION

For the reasons explained above, the defendant's Motion for Summary Judgment, ECF No. 17, is **DENIED IN PART** and **GRANTED IN PART**, and the plaintiff's Cross-Motion for Summary Judgment, ECF No. 19, is **DENIED**, without prejudice.

Defendant's motion is **DENIED AS MOOT** as to all withholdings already released by defendant under Exemptions 4, 5, and 6, as detailed in the Revised *Vaughn* Index, ECF No. 25-1. The motion is **DENIED**, without prejudice, (1) as to the categories described in Section III.A.1.c. due to insufficient information to determine whether the parties dispute that such categories contain confidential commercial information, and (2) as to the category of withheld information under Exemption 6 detailed as "names of NIH staff involved in administering the

grant," *see* Revised *Vaughn* Index at 2–4, 14, 19, 21, 31, 36–39, 52–53, 71, 73, 75, 78, 80, due to insufficient information to determine whether the asserted privacy interests outweigh the public interest in this information.  Defendant's motion is **GRANTED** with respect to (1) Categories One, Two, Three, Four, Five, and Six under Exemption 4, with the exception of any withholdings released by defendant as detailed in the Revised *Vaughn* Index, as the information was properly withheld under Exemption 4 as commercial and confidential, and (2) Categories One, Two, Three, Four, Five, and Six under Exemption 6, with the exception of any withholdings released by defendant as detailed in the Revised *Vaughn* Index, as the information was properly withheld under Exemption 6 as protected personnel and similar files.

For any records remaining at issue, the parties are directed to meet and confer and, by September 15, 2022, to submit to the Court a joint status report that sets forth (1) a list of the records that remain in dispute, in light of this Memorandum Opinion, identifying each such disputed record by Bates number, or other unique identifier, and by citation to the particular page(s) of the *Vaughn* index where the disputed record is described; and (2) a proposed briefing schedule for any further proceedings in this matter, including deadlines for the submission of any renewed dispositive motions, supplementary *Vaughn* indices, and supplementary declarations.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: September 3, 2022

_____
BERYL A. HOWELL
Chief Judge