**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR MEDICAL PROGRESS,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Defendant. | Civil Action No. 21-642 (BAH)<br><br>Judge Beryl A. Howell |

# MEMORANDUM OPINION

Over six years ago, in April 2020, plaintiff Center for Medical Progress ("CMP"), made a record request, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to the National Institutes of Health ("NIH"), a component of defendant U.S. Department of Health and Human Services, for information about certain grant applications submitted to NIH, and now, after resolution of two prior rounds of summary judgment motions and a truncated appeal to the D.C. Circuit, the FOIA case is again before the Court for a third round of cross-motions for summary judgment. The case was remanded, on defendant's request for vacatur of this Court's grant of summary judgment *to defendant*, because defendant noticed "inaccuracies in [its own] declarations and briefing on which the district court relied in upholding certain withholdings." Appellee's Mot. for Voluntary Remand at 2, *Ctr. for Med. Progress v. U.S. Dep't of Health & Hum. Servs.*, No. 23-5224, 2024 WL 2262634, at *1 (D.C. Cir. May 15, 2024).

The pending cross-motions reprise multiple issues previously addressed and decided in this case. *See* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 74; Pl.'s Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. ("Pl.'s Mot."), ECF No. 76. Now, with the benefit of a factual record

presumably corrected by defendant, for the reasons explained below, defendant's motion for summary judgment is again granted, and plaintiff's cross-motion for summary judgment is denied.

## I. BACKGROUND

Background for this longstanding FOIA dispute is described at length in two prior decisions resolving two separate rounds of summary judgment briefing, *see Ctr. for Med. Progress v. U.S. Dep't of Health & Hum. Servs.* ("*CMP I*"), No. 21-cv-642 (BAH), 2022 WL 4016617 (D.D.C. Sept. 3, 2022); *Ctr. for Med. Progress v. U.S. Dep't of Health & Hum. Servs.* ("*CMP III*"), 685 F. Supp. 3d 8 (D.D.C. 2023), *vacated and remanded*, No. 23-5224, 2024 WL 2262634 (D.C. Cir. May 15, 2024), and that background is incorporated by reference here. After a brief review of the factual and procedural background, including the conclusions reached in the prior decisions, the case's course before the D.C. Circuit and thereafter is summarized.

### A. Plaintiff's FOIA Request and Defendant's Productions

Plaintiff's FOIA request seeks grant applications submitted to NIH by three entities, with only one remaining at issue in this case, namely, the grant application submitted by the University of Pittsburgh. *CMP I*, 2022 WL 4016617, at *1 & n.1. The University of Pittsburgh had applied to NIH for a grant to serve as a GenitoUrinary Development Molecular Anatomy Project ("GUDMAP") Tissue Hub and Tissue Gathering site for NIH's subcomponent, the National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK"), and was awarded the grant. *Id.* at *1. The grant awarded funds to the University of Pittsburgh's project to collect certain human tissue samples, store them, and then distribute them to researchers working on genitourinary development. *See* First Decl. of Gorka Garcia-Malene, FOIA Officer, NIH ("First NIH Decl.") ¶¶ 20, 22, ECF No. 17-3. The University of Pittsburgh sometimes collects fetal tissue samples, though the record is somewhat unclear whether such collection occurs using funds provided under

this NIH grant or only in related processes and other grants through its preexisting Health Science Tissue Bank. *Compare id.* ¶ 31 ("While the released grant applications and related documents do not involve the provision of fetal tissue, the grant refers to fetal tissue research performed by the University of Pittsburgh."), *with* Def.'s Mot., Ex. 1 ("Revised Release of Letters of Support") at 1, ECF No. 74-2 (writing in support of the University of Pittsburgh obtaining this grant and referring to the project as one to "develop a Fetal Genitourinary Tissue Bank").

When defendant failed to make a timely determination as to plaintiff's FOIA request, plaintiff filed suit alleging that defendant had violated FOIA and seeking judicial supervision of production. *CMP I*, 2022 WL 4016617, at *2. Following completion of production of responsive records, the parties cross-moved for summary judgment, with plaintiff challenging defendant's invocations of FOIA Exemptions 4, 5, and 6. *Id.* After additional releases by defendant during summary judgment briefing, the singular withholding under Exemption 5 was corrected to reference Exemption 6, and therefore plaintiff's objections to the invocation of Exemption 5 were moot. *Id.* In total, of the 193 pages identified by defendant as responsive to plaintiff's request, four pages were withheld in full and others in part, under Exemption 4 and six categories of information under Exemption 6. *Id.*; *see also* Seventh Decl. of Gorka Garcia-Malene, FOIA Officer, NIH ("Seventh NIH Decl.") ¶ 9, ECF No. 62-1 (correcting the record as to the number of responsive pages).

### B. *CMP I*: First Round of Cross-Motions for Summary Judgment

In September 2022, summary judgment was denied to both parties as to two categories of information about which the record was insufficient to determine whether the claimed exemptions applied.[1] Otherwise, summary judgment was granted to defendant on all contested withholdings,

[1] These categories of information, neither of which is at issue in the instant round of summary judgment briefing, were (1) certain information withheld under Exemption 4 "due to insufficient information to determine

four categories of which are now, again, at issue and challenged by plaintiff. *CMP I*, 2022 WL 4016617 at *12, *15.

The four categories of information, for which summary judgment was granted to defendant and for which plaintiff again seeks disclosure in the instant pending cross-motions, were withheld under Exemptions 4 and 6. The first category of withheld information under Exemption 4 is "the number of tissue disbursements made and shipped." *Id.* at *6. Based on the record before the Court, this information was found to be commercial because the number of tissue disbursements made "pertains to the University of Pittsburgh's strategies for obtaining grants," and "'reflect[s] the volume of business conducted' by the University of Pittsburgh." *Id.* (quoting First NIH Decl. ¶ 25, then Revised *Vaughn* Index (Aug. 23, 2022) at 5-6, 20-21, 63-64, ECF No. 23-1). Taken along with other information also withheld, the number of tissue disbursements and their recipients would be the "equivalent to releasing line-item pricing information for individual services," allowing other grant-seekers to underbid the University of Pittsburgh. *Id.* (quoting First NIH Decl. ¶ 27). These data were also confidential because, although defendant "concede[d] that the total number of disbursements made in the calendar year . . . was publicly available," this was not so as to "the number of tissue samples disbursed to an individual investigator per year," and, moreover, this information had been shared by the University of Pittsburgh with NIH under assurances of privacy. *Id.* at *8, *11. Finally, foreseeable harm associated with release was established because of the potential for others to undercut the University of Pittsburgh's grant pricing and therefore

whether the parties dispute that such categories contain confidential commercial information," and (2) certain information withheld under Exemption 6, "detailed as names of NIH staff involved in administering the grant . . . due to insufficient information to determine whether the asserted privacy interests outweigh the public interest in this information." *CMP I*, 2022 WL 4016617 at *18 (internal quotation marks omitted).

negate the university's competitive edge. *Id.* at *11. Accordingly, defendant was granted summary judgment as to this category of information.

The second category of information withheld, pursuant to Exemption 4, was "the average number of abortions performed and the breakdown of the number of abortions done at Magee-Womens Hospital," *id.* at *9, as a subcategory of "the anticipated number of tissue collections for GUDMAP per year," since, like the number of tissue disbursements, that information "pertains to the University of Pittsburgh's strategies for obtaining grants" and "the volume of business conducted," *id.* at *6 (quoting First NIH Decl. ¶ 25, then Revised *Vaughn* Index at 5-6, 20-21, 63-64), which are "clearly instrumental to the university's commercial fortunes and fall[] squarely within the types of information courts in this Circuit have recognized as 'commercial,'" *id.* (citing *Braintree Elec. Light Dep't v. U.S. Dep't of Energy*, 494 F. Supp. 287, 290 (D.D.C. 1980)). The information was "confidential" because, while Pennsylvania law requires Magee to report "the total number of abortions performed within the hospital," that information is not made public unless the hospital had received "State-appropriated funds within the 12-calendar-month period immediately preceding the filing of the report." *Id.* at *9 (quoting 18 PA. STAT. AND CONS. STAT. ANN. § 3214(f)). Moreover, the "withheld information is 'not part of quarterly filings to the State,' but in fact 'represents calculated numbers covering an unknown number of years generated by the university, and inextricably intertwines in the data . . . a category of information that is discussed in the statute.'" *Id.* at *10 (quoting Third Decl. of Gorka Garcia-Malene, FOIA Officer, NIH ("Third NIH Decl.") ¶ 12, ECF No. 23-2). A declaration from the University of Pittsburgh's Vice-Chancellor of the University's Office of Research Protections confirmed that these numbers were kept confidential, *id.* (citing First NIH Decl., Ex. E., Decl. of Bill Yates, Vice-Chancellor, University of Pittsburgh, Office of Research Protections, ("Yates Decl.") ¶¶ 7-8, ECF No. 17-3),

and plaintiff did not contest that this information was submitted to the government "under an assurance of privacy," *id.* at *11. Since disclosure of this information would put the University of Pittsburgh at a "competitive disadvantage" when seeking future grants, foreseeable harm associated with its release was established, *id.*, and defendant was therefore granted summary judgment as to this category of information.

The third category of information withheld, pursuant to Exemptions 4 and 6, was the "location of tissue procurement sites," including information about the physical layout of Magee-Womens Hospital and where the tissue procurement sites are located within the hospital. *Id.* at *9, *12. As to Exemption 4, this information was deemed "commercial" because, like the Magee abortion statistics, "it pertains to the University of Pittsburgh's pricing mechanisms" in that "the procurement site location and size factor[] into 'the costs of administering the grant'" and "disclose[] the university's internal supply arrangements." *Id.* at *6 (quoting First NIH Decl. ¶ 27). Additionally, this information was confidential because, while the fact that the University of Pittsburgh procured some tissue from Magee had been made public, the specific sites within the hospital had not, *id.* at *9, and plaintiff conceded this information was "submitted [as part of the grant application] under an assurance of privacy," *id.* at *11. For the same reasons, namely the potential impact on the university's "commercial fortunes" by putting the University of Pittsburgh at a "competitive disadvantage" in grant applications, defendant had demonstrated foreseeable harm. *Id.* at *6, *11. Exemption 6 also independently protected the specific tissue procurement sites within Magee-Womens Hospital. *Id.* at *14. Plaintiff conceded these pieces of information constituted "similar files" potentially subject to Exemption 6. *Id.* at *12. A substantial privacy interest existed because "defendant ha[d] fairly asserted fetal tissue-related violence and harassment as a privacy interest for the names, addresses, titles, and other identifying information

for persons and locations associated with fetal tissue research," and there was therefore a "potential for harm that could result if harassers or those with violence on their minds learned the specific locations within the hospitals where individuals worked on fetal tissue research, procurement, or processing." *Id.* at *13-14. This privacy interest outweighed any public interest because plaintiff did "not articulate how the release of any of the disputed categories of information, which involve non-agency third parties, will shed light on how the agency operates in ways that ha[ve] not already been disclosed by the released information," such as the fact that Magee-Womens Hospital was, in general, a source of tissue samples. *Id.* at *14. As to this category of information's withholding under Exemption 6, plaintiff lodged no challenge to satisfaction of the foreseeable harm requirement, and defendant was granted summary judgment. *Id.* at *15.

The fourth category of information addressed plaintiff's dispute that redacted letters of support submitted alongside the University of Pittsburgh's grant application, *id.* at *2, *16, were "commercial," within the meaning of Exemption 4, and whether identifying information about the authors of those letters was properly subject to Exemption 6, *id.* at *7, 12. The Court noted that "[n]either the initial nor the revised *Vaughn* index cite[d] Exemption 4 as a basis for withholding the letters of support," but "in light of defendant's consistent claims in its briefing and declarations that Exemption 4 applies to the letters of support, . . . address[ed] whether defendant has met all the requirements to claim withholding of information related to client identities under Exemption 4." *Id.* at *7 n.10. The Court held that the letters of support were commercial, since, according to the then-operative NIH declarations, (1) those letters "identif[ied] clients of the university that purchase the tissue it[] procures," and (2) "some of the letters also disclose[d] the location of procurement sites," which had been found to be protected confidential commercial information. *Id.* at *7 (citing First NIH Decl. ¶ 28; Second Decl. of Gorka Garcia-Malene, FOIA

Officer, NIH ("Second NIH Decl.") ¶ 8, ECF No. 21-1). Plaintiff did not dispute that this information was confidential, so Exemption 4 applied. *Id.* at *8 n.12.

Separately, Exemption 6 was also determined to apply to identifying information about these third-party letter writers. *Id.* at *15. These individuals had a substantial privacy interest in keeping their names from disclosure because "the record establishe[d] a clear risk that disclosure of the withheld information would likely subject persons associated with fetal tissue procurement and research to targeting, harassment, and potentially violence." *Id.* at *13. This interest outweighed any public interest in the names of these individuals, particularly given the D.C. Circuit's caution that "Exemption 6 'provides greater protection to private individuals, including applicants for federal grants and officials of regulated private companies, and to low-level government employees, than to government officials with executive responsibilities.'" *Id.* at *15 (quoting *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 938 (D.C. Cir. 1982)). Since disclosure of this information "would foreseeably cause competitive harm 'because competitors could attempt to underbid the University of Pittsburgh for its clients,'" foreseeable harm was established, *id.* *11 (quoting First NIH Decl. ¶ 28), and summary judgment was granted to defendant, *id.* at *15.

Finally, in addition to granting summary judgment to defendants on these four specific categories, among others, defendant was found to have met its segregability obligations by showing that all reasonably segregable, nonexempt information had been released and by attesting to a line-by-line review of documents and to multiple iterations of re-release. *Id.* at *16. Plaintiff's two objections to this finding were rejected. First, plaintiff argued that the iterative release of more information indicated that more segregable information may still be hiding in the documents, which argument was rejected on the basis that these iterative releases in fact showed a "good-faith

effort on the [agency's] part to segregate nonexempt information where possible." *Id.* (alteration in original) (quoting *Schoenman v. FBI*, 575 F. Supp. 2d 136, 161 (D.D.C. 2008)). Second, "plaintiff dispute[d] defendant's claim that the letters of support contain information protected by Exemptions 4 and 6 and . . . so intertwined with non-exempt information that NIH could not reasonably segregate any portion due to the fact that at least some Exemption 4 withholdings have now been removed." *Id.* (internal quotation marks and citation omitted). Plaintiff, however, offered "nothing beyond speculation" to support this. *Id.* Although noting the inconsistency between the *Vaughn* index, which did not list Exemption 4 as a basis for certain withholdings, and defendant's briefing, which invoked Exemption 4 for the same withholdings, the Court concluded that since Exemption 6 also fully justified all withholdings, and defendant had obtained summary judgment on Exemption 4 based on the record before the Court at the time, these inconsistencies were insufficient to call the agency's segregability determinations into question. *Id.*

### C. *CMP II:* Plaintiff's Motion for Reconsideration

Following disposition of the first round of summary judgment motions, the parties proposed a schedule for another round of dispositive briefing on the withholdings for which the Court found the record to be insufficient to reach resolution. Pl.'s Status Report (Sept. 15, 2022), ECF No. 29. Before that briefing began, however, plaintiff moved to alter or amend the first summary judgment decision, pursuant to Federal Rule of Civil Procedure 59(e), "challenging factual assertions about employee harassment and abortion numbers included in defendant's Third Declaration of Gorka Garcia-Malene . . . referenced in the Memorandum Opinion." *CMP III*, 635 F. Supp. at 12. Specifically, plaintiff reiterated arguments that "Magee Women's Hospital had reported data regarding the abortions performed there in quarterly statements to the Pennsylvania Department of Health," and that defendant "failed to present concrete evidence of . . . harassment"

of fetal tissue researchers. *CMP II*, 2022 WL 17976633, at *2. That motion for reconsideration was denied, since both arguments had already been addressed and rejected. *Id.* at *2-3.

**D. *CMP III:* Second Round of Cross-Motions for Summary Judgment**

In the second round of dispositive briefing, plaintiff sought release of redacted names of NIH employees withheld under Exemption 6, and three categories of records withheld under Exemption 4. *CMP III*, 635 F. Supp. 3d at 12. During briefing, defendant released two of the three challenged categories withheld under Exemption 4, and "lifted" certain other Exemption 4 redactions, mooting the challenges plaintiff raised in summary judgment briefing to withholdings under Exemption 4. *Id.* at 12-13. Plaintiff withdrew a challenge to one category of Exemption 6 withholdings. *Id.* at 13. "In summary, what remain[ed] [was] plaintiff's challenge to Exemption 6 withholdings of two categories of information: (1) the name of the 'NIH Program Official'; and (2) the name of the 'NIH Grants Management Specialist.'" *Id.* Summary judgment was granted to defendant as to both, for reasons not relevant here except that "plaintiff [again] claim[ed] a complete lack of factual support for defendant's contention that [individuals] affiliated with this grant project are subject to risks of harassment." *Id.* at 17. That argument was rejected, given that "[p]laintiff [had] seize[d] a third opportunity to decry a supposed dearth of evidence of harassment[,] [and] such an effort to force the Court to revisit its prior findings based on arguments already rejected twice [was] both unsuccessful and unacceptable." *Id*. at 18.

**E. Appeal and Remand**

Plaintiff appealed. While the appeal was pending, defendant moved before the D.C. Circuit to vacate the second summary judgment order in its favor and remand the case because defendant had identified certain "inaccuracies in declarations it filed in district court." *CMP*, 2024 WL

2262634, at *1. The D.C. Circuit vacated the judgment while expressly disclaiming that the remand "reflect[ed] a view on the order's merit." *Id.*

Upon direction from this Court to "identify[] precisely" the inaccuracies previously presented in submitted declarations, Min. Order (July 11, 2024), defendant clarified as follows: "in discussions with the University of Pittsburgh that took place after the Center for Medical Progress filed its appeal, the University informed NIH that researchers do not purchase tissue from the GUDMAP tissue hub when they use the tissue for GUDMAP-supported research; in those instances, the tissue is provided free of charge." Def.'s Status Report (July 24, 2024) ¶ 5, ECF No. 62 (citing Seventh NIH Decl. ¶ 7). "Therefore, though NIH did not know it at the time, it was inaccurate for the government's declaration to describe the authors of the letters of support as 'employees of the clients that purchase the tissue the University of Pittsburgh procures using grant funds.'" *Id.* (quoting First NIH Decl. ¶ 28).

Additionally, defendant identified that "shortly after the government filed its motion for summary judgment [in the first round of summary judgment motions], . . . NIH lifted its Exemption 4 withholdings from the[se] [same] letters of support and rereleased them to [plaintiff] without any marked Exemption 4 redactions." *Id.* ¶ 6 (citing Seventh NIH Decl. ¶ 6). "Yet, the government's subsequent briefs and the NIH's later declarations continued to argue that the letters of support were covered by Exemption 4," *id.*, a discrepancy noted in the Memorandum Opinion deciding the first round of cross-motions for summary judgment, *CMP I*, 2022 WL 4016617, at *7 n.10. Nevertheless, the same information previously marked as exempt in conjunction with Exemption 4 was withheld under Exemption 6. Def.'s Status Report (July 24, 2024) ¶ 6. At the

time of the status report, defendant was "considering whether to remove some portions of the Exemption 6 redactions on the letters of support." *Id.*[2]

Additionally, defendant pointed out two additional and previously unidentified errors. First, "the government neglected to mark certain information identifying tissue procurement and processing sites as covered by Exemption 6, and instead marked them only as covered by Exemption 4." *Id.* ¶ 8 (citing Seventh NIH Decl. ¶ 19). Defendant emphasized that "[o]ther instances where procurement and processing sites are identified were marked as covered by both exemptions, and NIH's existing declarations thoroughly explain why Exemption 6 applies to the identification of those sites." *Id.* Second, defendant identified a "typographical error" in the total number of pages located during the search—though initially stated as 192, the correct number was 193. *Id.*

**F. Mediation and Instant Third Cross-Motions for Summary Judgment**

Defendant subsequently re-released all letters of support to plaintiffs with all Exemption 4 notations removed and certain Exemption 6 withholdings lifted, resulting in the released letters containing only small, piece-meal redactions under Exemption 6 of names and other information that could be used to identify the authors. Jt. Status Report (Aug. 9, 2024), ECF No. 63. The case was referred to mediation in May 2025 upon request of the parties. Min. Order (May 27, 2025). Mediation failed, and the parties proposed a briefing schedule for a third round of summary judgment briefing, which was entered by the Court. Min. Order (Nov. 26, 2025). The parties subsequently cross-moved for summary judgment, again, and these two motions became ripe for

[2] In response to the Court's query about how these errors arose and why the government continued to argue for the application of Exemption 4 to these letters of support, despite not actually asserting Exemption 4 as to these letters, defendant said, in short, that it had no idea how these mistakes had happened or whether the choice to withdraw Exemption 4 assertions as to these letters was related to the discovery that tissue is provided to GUDMAP researchers free of charge. *Id.* ¶ 7.

resolution at the end of April 2026, shortly after the fifth anniversary of the filing of this lawsuit. *See* Def.'s Reply in Support of Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Reply"), ECF No. 79; Pl.'s Reply in Support of Cross-Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 81.

## II. LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) ("A party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law."). "'The mere existence of some alleged factual dispute between the parties' will not defeat summary judgment; 'the requirement is that there be no genuine issue of material fact.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Most FOIA cases "can be resolved on summary judgment." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (quoting *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011)).

"Agencies may withhold from disclosure information that falls within one of the Act's nine enumerated exemptions," but "[t]hose 'limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Hum. Rts. Def. Ctr. v. U.S. Park Police*, 126 F.4th 708, 712-13 (D.C. Cir. 2025) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). "This 'strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents.'" *Id.* at 713 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "The agencies may carry that burden by submitting declarations

attesting to the basis for the agency's decision." *Am. First Legal Found. v. U.S. Dep't of Agric.*, 126 F.4th 691, 694 (D.C. Cir. 2025) (internal quotation marks omitted) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1262 (D.C. Cir. 2023)). "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 734-35 (D.C. Cir. 2017) (quoting *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)).

## III. DISCUSSION

The extended litigation in this case has been necessitated by defendant's initial provision of an incomplete record and defendant's multiple corrections over time to the factual record, thereby providing plaintiff with renewed opportunities to obtain reconsideration of its arguments. At this time, plaintiff has four remaining objections: (1) to withholdings, under Exemption 4, of the number of tissue disbursements issued by the University of Pittsburgh, *see* Pl.'s Mem. in Support of Cross-Mot. for Summ. J. ("Pl.'s Mem.") at 16-17, ECF No. 76; (2) to withholdings, under Exemption 4, of "Magee abortion statistics," *id.* at 17-18; (3) to withholdings, under Exemption 6, of "the signatories and the institutions who supported the Tissue Hub grant," from letters of support submitted with the University of Pittsburgh's grant application seeking NIH funds to function as a tissue hub and collection site for GUDMAP, *id.* at 7-8; and (4) to withholding, under Exemption 6, of two pages comprising the "the physical description of Magee Women's Hospital," specifically the tissue procurement and processing sites within the hospital, *id.* at 13-14. Each of these contested withholdings has been previously addressed, with summary judgment granted to defendant. *See CMP I*, 2022 WL 4016617, at *12 (tissue disbursement

numbers and Magee abortion statistics fall under Exemption 4); *id.* at *15 (identifying information about letter of support authors and specific procurement site location information fall under Exemption 6). These disputes are discussed *seriatim* in light of plaintiff's continuing challenges and defendant's factual corrections to the record.

**A. Information Withheld Pursuant to Exemption 4**

Exemption 4 exempts from disclosure "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential." 5 U.S.C. § 552(b)(4). Where withheld records do not contain trade secrets, an agency must establish that the records are "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential" to sustain the burden of showing that Exemption 4 was properly applied. *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). Here, the parties do not dispute that all of the documents came from a "person," meeting this prerequisite for application of Exemption 4, Pl.'s Mem at 16 n.10, and leaving only the "commercial" and "confidential" prongs under dispute.

Upon satisfying the Exemption 4 requirements, the government must then also satisfy FOIA's statutory foreseeable-harm requirement. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I) ("An agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by [one of the nine FOIA exemptions] . . . ."). Here, plaintiff challenges whether categories of information qualify as confidential commercial information subject to protection under Exemption 4: (1) the number of tissue disbursements made and shipped by the University of Pittsburgh; and (2) statistics regarding the number of abortions performed at Magee-Womens Hospital. Pl.'s Mem. at 16. As already noted, these same challenges to application of Exemption 4 were previously rejected, with summary judgment granted to

defendant. *See CMP I*, 2022 WL 4016617, at *6, *8-9; *see also CMP II*, 2022 WL 17976633, at *2 (rejecting plaintiff's attempt to relitigate the confidentiality of the Magee abortion statistics). Upon reconsideration, summary judgment is once again granted to defendant.

***1. Sufficiency of Showing that the Withheld Information Is Commercial***

The term "commercial" is not defined in the FOIA. Absent a precise statutory definition or clarity from the legislative history, the D.C. Circuit has "consistently held that [this] term[] . . . in [Exemption 4] should be given [its] ordinary meaning[]." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290; *see also Citizens for Resp. & Ethics*, 58 F.4th at 1263 ("Because FOIA does not define the word 'commercial,' we have given that term its ordinary meaning."). "[I]nformation is 'commercial' under this exemption if, 'in and of itself,' it serves a 'commercial function' or is of a 'commercial nature.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)). Thus, "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business," fall within the scope of "commercial" information. *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290. For instance, "revenue, net worth, income, and EBITDA" information in requested documents is plainly commercial. *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009); *see also Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (holding that customer lists constitute commercial information); *Racal-Milgo Gov't Sys., Inc. v. Small Bus. Admin.*, 559 F. Supp. 4, 6 (D.D.C. 1981) (finding that Exemption 4 "shielded information much more sensitive than mere prices," such as "audits of private concessions in national parks; technical proposals for development of a system to analyze gases generated by petroleum refineries; general selling prices, inventory balances, profit margins, purchase activity, freight charges, costs of goods

sold, and customer names, obtained from a utility in the course of a government investigation; appraised value for customs duty assessment purposes of imported machinery parts; design recommendations, design concepts, a customer list, and biographical data on key employees; and computer usage, manpower allocation, travel costs, biographical data on employees, and detailed cost data from a contract with the Government" (footnotes omitted)).

The scope of "commercial" information has also been applied more broadly to records containing information in which the provider of the records has "a commercial interest." *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319-20 (D.C. Cir. 2006) (finding letters describing favorable market conditions for domestic lumber companies "plainly contain commercial information within the meaning of Exemption 4"); *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290 (finding information to be commercial when it was helpful or "instrumental" to the provider's business interests). Although "commercial harms a business might suffer following disclosure" are not "alone . . . sufficient to establish that information is 'commercial' under Exemption 4"—*i.e.*, the information must still "in and of itself . . . serve[] a commercial function"—such consequences are certainly "relevant" and can "reinforce[]" the commercial nature of the information. *Citizens for Resp. & Ethics*, 58 F.4th at 1268. Further, the "commercial" inquiry does not turn on the provider's status as a for-profit or not-for-profit entity. *See N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 50 (1st Cir. 2015) (rejecting an argument that "a non-profit organization . . . cannot be said to possess commercial information within the meaning of Exemption 4" because "[t]he term 'commercial' as used in the statute modifies 'information' and not the entity supplying the information" (citing 5 U.S.C. § 552(b)(4)); *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 102 (D.D.C. 2010) (rejecting an argument that Exemption 4 did not protect information from a non-profit federal grant

recipient where the organization's operations "ha[d] no logical connection to making a profit" (internal citations omitted)); *Smolen v. Fed. Aviation Admin.*, No. 22-CV-44 (LJL), 2023 WL 3818105, at *6 (S.D.N.Y. June 2, 2023) ("Non-profit organizations as well, just like public or private organizations, engage in commerce and have commercial and financial information which is protected by FOIA Exemption 4."); *cf. Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987), *vacated on other grounds*, 975 F.2d 871 (D.C. Cir. 1992) (en banc) (determining that the defendant's "non-profit status is not determinative of the character of the information it reports").[3] Nor does information lose its commercial nature "when supplied to get [a federal] grant." *N.H. Right to Life*, 778 F.3d at 50 n.6.

**a. *Tissue Disbursement Numbers***

This Court previously held that the tissue disbursement numbers were commercial because they "pertain[] to the University of Pittsburgh's strategies for obtaining grants" by "reflect[ing] the volume of business conducted by the University of Pittsburgh" and therefore are "clearly instrumental to the university's commercial fortunes and fall[] squarely within the types of information courts in this Circuit have recognized as commercial." *CMP I*, 2022 WL 4016617, at *6 (internal quotation marks and citations omitted). This all remains true, notwithstanding the clarification that for tissue disbursements issued specifically under the GUDMAP grant, the University of Pittsburgh provides them free of charge. *See* Seventh NIH Decl. ¶ 7. The number of tissue disbursements, whether or not without charge, still serves a commercial function because it indicates that the University of Pittsburgh is a reliable source of tissue samples for researchers

[3] The D.C. Circuit's en banc opinion in *Critical Mass Energy Project* clarified the "test for determining when financial or commercial information in the Government's possession is to be treated as confidential under Exemption 4," and vacated the panel opinion due to its flawed confidentiality analysis. *See Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc). The Court, however, agreed that the information at issue was commercial in nature without revisiting the panel's reasoning. *Id.* at 880.

in the field, thereby demonstrating the University of Pittsburgh's commercial strengths and competitive position as a potential grant recipient.

Plaintiff revives this dispute about whether tissue disbursement numbers are commercial by arguing solely that, since "[f]ederal law prohibits the selling or transferring of human fetal tissue for 'valuable consideration,'" and "legally prohibited activity cannot form a basis for commercial enterprises," information about the number of tissue disbursements cannot be "commercial" to fall under Exemption 4. Pl.'s Mem. at 16-17 (quoting 42 U.S.C. § 289g-2). Certainly, as defendant confirms, nothing in the corrected record "suggest[s] that the University of Pittsburgh did any such thing" as sell human fetal tissue. Def.'s Reply at 8. Yet, this fact, standing alone, does not, as plaintiff posits, mean the information has no relation to the funding of the University of Pittsburgh—and such funding qualifies as a financial interest that is commercial, within the meaning of Exemption 4. *See* Yates Decl. ¶¶ 9-11 (describing the University of Pittsburgh's commercial interest in maintaining its "competitive advantage" when applying for NIH research grants and preventing "staff layoffs" and harm to its "continued research capabilities" and "status in the research community" that could result from loss of funding).

Plaintiff points to defendant's argument that tissue disbursement numbers reflect the volume of business conducted by the University of Pittsburgh under the GUDMAP arrangement and are therefore "'instrumental' to the university's commercial enterprise," Pl.'s Mem. at 16 (quoting Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mem.") at 14, ECF No. 74), as evidence that the University of Pittsburgh may be buying or selling fetal tissue, but in fact defendant's argument is fully consistent with legal procurement and distribution of fetal and other tissue. NIH's declarations, including early declarations containing the incorrect assertion that GUDMAP researchers would purchase samples from the University of Pittsburgh, *see, e.g.*, First

NIH Decl. ¶ 28, specify that "information like . . . the number of tissue samples procured, and the costs of administering the grant" would "provide[] the competition with the precise figure it needs to undercut the University of Pittsburgh *in future grant requests for similar services*," *id.* ¶ 27 (emphasis added). The same is true of tissue disbursement numbers—releasing these data would allow the competition to understand what volume of business would be needed to compete with the University of Pittsburgh for grants, which in no way implies that the University of Pittsburgh is selling fetal tissue to paying customers. Defendant has shown that the tissue disbursement numbers are commercial.

***b. Magee Abortion Statistics***

The Magee abortion statistics are commercial for the same reason, as this Court previously found—they reflect the "volume of business" done by the University of Pittsburgh and are critical to the university obtaining grants. *CMP I*, 2022 WL 4016617, at *6. Plaintiffs primarily challenge this conclusion on the ground that "Magee is not a party here and its statistics do not in any way reveal any commercial aspect of Pittsburgh's grant," since "Pittsburgh and Magee are separate business entities and Defendant has presented no evidence of a business relationship with Magee." Pl.'s Mem. at 17. Although separate business entities, Magee's business relationship with the University of Pittsburgh for the grant at issue is significant. The parties agree that "Magee-Women's Hospital has been publicly acknowledged as the location of fetal tissue procurement" for the University of Pittsburgh, *see* Third NIH Decl. ¶ 24 (quoting Pl.'s Reply in Support of First Cross-Mot. for Summ. J. at 5, ECF No. 22), and this Court has previously held that these abortion statistics "reflect[] the volume of business" conducted by the university, and that such "information disclosing 'intimate aspects of a . . . business such as supply chains' is 'plainly' commercial," making these numbers commercial since they reflect how much of the

University of Pittsburgh's supply of fetal tissue may be obtained from Magee, *CMP I*, 2022 WL 4016617, at *6 (quoting Revised *Vaughn* Index at 5-6, 20-21, 63-64, then *Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 102 (D.D.C. 2013)).

Plaintiff once again raises the specter of illegal sales of fetal tissue, but this misunderstands both the law and the structure of the University of Pittsburgh's commercial operation. The reason that Pittsburgh's grant application referenced Magee abortion statistics in the first place was that those statistics support its grant application by showing Pittsburgh has a viable source of tissue samples. *CMP I*, 2022 WL 4016617, at *6 (emphasizing that this information "pertains to the University of Pittsburgh's strategies for obtaining grants" (quoting First NIH Decl. ¶ 25)). *That* is the source of Pittsburgh's commercial fortunes in obtaining grant funding, not the buying and selling of fetal tissue. Moreover, the source of tissue samples is still relevant to the "pricing" of the University of Pittsburgh's operations—in the form of the "costs of administering the grant," First NIH Decl. ¶ 27—because federal law permits "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue," 42 U.S.C. § 289g-2(e)(3). Thus, the University of Pittsburgh will have expenditures to obtain fetal tissue, even if not purchasing the fetal tissue itself.

These statistics are commercial, as this Court has already found.

### ***2. Sufficiency of Showing that the Withheld Information Is Confidential***

A "commercial" document may only be withheld under Exemption 4 if it is "privileged" or "confidential." 5 U.S.C. § 552(b)(4). The Supreme Court recently clarified the meaning of "confidential" under Exemption 4 to require that the commercial or financial information is (1) "both customarily and actually treated as private by its owner," and (2) "provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S.

427, 440 (2019). The first requirement has long been the rule in this Circuit with respect to information provided to agencies voluntarily, *see Critical Mass Energy Project*, 975 F.2d at 879-80, but *Food Marketing* expanded its application to all commercial information provided to agencies whether voluntarily or otherwise, *see* 588 U.S. at 437-38. Although the Supreme Court did not "need to resolve" whether the second condition—assurance of privacy—was necessary in every case, *id.* at 435, whether the agency provided an assurance of privacy is undoubtedly relevant to determining whether commercial information possessed by an agency is "confidential," *id.* at 440; *see also Ctr. for Investigative Reporting v. Customs and Border Prot.*, 436 F. Supp. 3d 90, 112-13 (D.D.C. 2019). "In addition, in assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass Energy Project*, 975 F.2d at 872, 878-80); *see also Food Mktg.*, 588 U.S. at 434 (explaining that "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by *the person* imparting it," as "it is hard to see how information could be deemed confidential if *its owner* shares it freely" (emphasis added)).

***a. Tissue Disbursement Numbers***

The Court has previously held that the tissue disbursement numbers are confidential in the sense that they are customarily treated as private and are given to the government under assurance of privacy. *CMP I*, 2022 WL 4016617, at *8-11. In a footnote, plaintiff asserts that it "contests the confidentiality of much of the tissue disbursement information," but makes no supporting arguments on this issue since, in plaintiff's view "it is unnecessary for the Court to analyze the confidentiality." Pl.'s Mem. at 17 n.11. Therefore, without any specific reason stated to revisit the

reasoning from the first round of summary judgment briefing in this case, the reasoning already laid out in *CMP I* for finding that these numbers are confidential is adopted in full.

***b. Magee Abortion Statistics***

Similarly, this Court has concluded already that the Magee abortion statistics are confidential because they are customarily treated as such, are given to the government under assurance of privacy, and differ from the abortion statistics Magee is legally required to file quarterly with the state of Pennsylvania, which plaintiff has repeatedly argued undercuts the confidentiality of these data. *CMP I*, 2022 WL 4016617, at *9, *11; *see also CMP II*, 2022 WL 17976633, at * 2.

Plaintiff revives this argument, stating that statistics about the number of abortions performed at Magee cannot be confidential because "Magee is legally obligated to file quarterly reports with the Pennsylvania Department of Health that contain the numbers of abortions done at Magee." Pl.'s Mem. at 18. That argument was previously rejected because defendant "clarifie[d] that the withheld information is not part of quarterly filings to the State, but in fact represents calculated numbers covering an unknown number of years . . . inextricably intertwin[ing]" reported and unreported statistics, and plaintiff then failed to meet its burden of demonstrating that Magee "submitted a publicly available report for each year covered by the withheld information." *CMP I*, 2022 WL 4016617, at *9 (internal quotation marks and citation omitted). Plaintiff makes no serious effort to engage with this Court's previous ruling on this issue, other than arguing it "is of no consequence" that "the information was not presented in exactly the same manner." Pl.'s Mem. at 18. That previous ruling, unchanged by any facts presented by plaintiff, will not be disturbed.[4]

[4] Plaintiff urges that defendant should be treated as having conceded the point that Magee abortion statistics are not confidential because this issue was not addressed by defendant in opposing plaintiff's cross-motion for summary judgment. Pl.'s Reply ¶ 11. "When a party fails to specifically respond to certain arguments, a court 'may'—but need not—treat those arguments as conceded." *Dist. of Columbia Int'l Pub. Charter Sch. v. Lemus*, No. 21-cv-

Given that Magee's quarterly abortion reports are statutorily required, not voluntary, and therefore share only the information expressly statutorily required, those reports will not be treated as forfeiting the confidentiality of different, though related, statistics.

### *3. Foreseeable Harm*

The FOIA Improvement Act provides that "[a]n agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by" one of the nine FOIA exemptions. 5 U.S.C. § 552(a)(8)(A)(i)(I). This provision requires agencies withholding information under an exemption to show not only that a withheld record "falls within a FOIA exemption," but also "that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'" *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (alteration in original) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).

Plaintiff argues that as to both categories of information withheld under Exemption 4, defendant "failed to explain the foreseeable harm" of release. Pl.'s Mem. at 17 n.11 (tissue disbursement); *see id.* at 18 (similar for abortion statistics). To satisfy the foreseeable harm requirement, defendant must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing "genuine harm to [its] owner's economic or business interests," *Food Mktg.*, 588 U.S. at 441 (Breyer, J., concurring in part), and thereby dissuading others from submitting similar information to the government, *see Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974), *abrogated on other grounds by Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) (explaining that Exemption 4 "is intended to encourage individuals to provide

---

0223 (RCL), 2022 WL 873549, at *3 n.2 (D.D.C. Mar. 24, 2022) (quoting *Campaign Legal Ctr. v. Fed. Election Comm'n*, 520 F. Supp. 38, 50 (D.D.C. 2021)). Here, however, where plaintiff has raised this argument in multiple rounds of briefing, to which defendant has responded repeatedly in both briefing and declarations, and the Court has ruled against plaintiff previously, the argument will not be treated as conceded.

certain kinds of confidential information to the Government," and to "protect[] persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication" (quoting *Soucie v. David*, 448 F.2d 1067, 1078 (D.C. Cir. 1971))).

The foreseeable harm of releasing either the tissue disbursement numbers or the Magee abortion statistics is well articulated throughout declarations and briefing by defendant, and has already been found to exist. These numbers, taken together with other redacted information, if released "would put the University of Pittsburgh at competitive disadvantage because release of the information at issue 'is equivalent to releasing line-item pricing information for individual services, and provides the competition with the precise figure it needs to undercut the University of Pittsburgh in future grant requests for similar services.'" *CMP I*, 2022 WL 4016617, at *11 (quoting First NIH Decl. ¶ 27). Although tissue disbursement numbers and anticipated tissue collections are not themselves prices, they are still competitive grant information that would inform competitors of precisely how much business the University of Pittsburgh is doing and using to obtain government grants. *Id.*

Defendant has thus shown all of the elements of Exemption 4 as to both the tissue disbursement numbers and the Magee abortion statistics, as this Court has already held. Summary judgment is therefore granted to defendant and denied to plaintiff as to each of these two categories.

**B. Information Withheld Pursuant to Exemption 6**

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Milton v. U.S.*

*Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co. v. Nat'l Aeronautics & Space Admin.*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc)). Once this threshold determination is met, the next inquiry is whether disclosure "'would compromise a substantial, as opposed to *de minimis*, privacy interest,' because '[i]f no significant privacy interest is implicated . . . FOIA demands disclosure.'" *Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (alteration and omission in original) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). The standard "means less than it might seem," as a substantial privacy interest is "anything greater than a *de minimis* privacy interest." *Id.* at 1229-30. When a substantial privacy interest in the information is present, courts employ a balancing test to determine whether release of such information constitutes a clearly unwarranted invasion of personal privacy, *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982); *Rose*, 425 U.S. at 372, by weighing "the privacy interest that would be compromised by disclosure against any public interest in the requested information," *Multi Ag Media LLC*, 515 F.3d at 1228. "[A] privacy interest may be substantial," yet nonetheless "be insufficient to overcome the public interest in disclosure." *Id.* at 1230. "Exemption 6's requirement that disclosure be 'clearly unwarranted' instructs us to 'tilt the balance (of disclosure interests against privacy interests) in favor of disclosure.'" *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (quoting *Wash. Post Co.*, 690 F.2d at 261).

Plaintiff objects to the withholding of two types of information pursuant to Exemption 6. First, plaintiff seeks release of information included in the letters of support submitted with the University of Pittsburgh's grant application. Pl.'s Mem. at 7. Specifically, plaintiff challenges the withholding "only . . . [of] information that will shed light on government action in regard to Pittsburgh's grant: the signatories and institutions who supported the Tissue Hub grant," and not

of those person's "office numbers, signatures, and research projects" or other information in the letters of support. Pl.'s Mem. at 7-8. Second, plaintiff challenges the "withholding [of] large blocks of information [defendant] describes as 'identifying information' about the physical description of Magee Women's hospital." Pl.'s Mem. at 13-14.

***1. Similar Files***

As a threshold matter, for Exemption 6 to apply, the withheld information must constitute "similar files" to "personnel and medical files." 5 U.S.C. § 552(b)(6). The term "'similar files' is construed broadly and 'is intended to cover detailed Government records on an individual which can be identified as applying to that individual.'" *Gov't Accountability Project*, 699 F. Supp. 2d at 105-06 (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982)). "[C]ourts look 'not to the nature of the files,' but rather to 'the nature of the information' at issue." *Skybridge Spectrum Found. v. FCC*, 842 F. Supp. 2d 65, 83 (D.D.C. 2012) (quoting *N.Y. Times*, 920 F.2d at 1006); *see also Jud. Watch v. Food & Drug Admin.*, 449 F.3d 141, 152-53 (D.C. Cir. 2006) (explaining that "similar files" encompasses "not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[] a palpable threat to privacy'" (alteration in original) (quoting *Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 391 (D.C. Cir. 1987))).

Plaintiff expressly disclaims disputing whether the withheld information in the letters of support constitute "similar files," *see* Pl.'s Mem. at 6 n.2, and makes no mention of the "similar files" requirement as to the physical description of Magee, *see id.* at 14-15 (arguing that the "redactions of the Magee description fail for two reasons," neither of which is the "similar files" requirement). Indeed, both categories of information—the names and institutional employers of letter-of-support authors, and the location of specific tissue procurement sites within Magee that

could be used to identify individuals' workplaces—constitute "bits of personal information," *Jud. Watch*, 449 F.3d at 152, that "appl[y] to . . . particular individual[s]," *Wash. Post Co.*, 690 F.2d at 260 (quoting *Wash. Post Co.*, 456 U.S. at 602). Thus, as the D.C. Circuit has confirmed as to the "names and addresses of persons and businesses associated with" a drug that induced abortion, Exemption 6 may be triggered even though such categories of personal information "are not in files about an individual." *Jud. Watch*, 449 F.3d at 152-53.

Accordingly, the appropriateness of defendant's Exemption 6 withholdings turns on whether the requested information implicates a substantial privacy interest and, if so, whether release of the information would be "clearly unwarranted" in view of the public interest, if any, in the requested documents. 5 U.S.C. § 552(b)(6).

### *2. Substantial Privacy Interest*

In construing Exemption 6, the D.C. Circuit has repeatedly found a substantial privacy interest in personal information that could subject individuals to "injury and embarrassment." *Jud. Watch*, 449 F.3d at 153 (quoting *Wash. Post Co.*, 456 U.S. at 599); *see Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at 875-78 (explaining that "Exemption 6 is designed to protect personal information" that is "embarrassing or of an intimate nature," or could "occasion significant annoyance" or exposure to unwanted solicitation or harassment); *see also Jud. Watch, Inc., v. U.S. Dep't of State*, 875 F. Supp. 2d 37, 46 (D.D.C. 2012) ("A substantial privacy interest exists in avoiding embarrassment, retaliation, or harassment and intense scrutiny by the media that would likely follow disclosure." (citing *Ray*, 502 U.S. at 176 n.12 (1991); *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 167 (2004))). "[T]he disclosure of names is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the

consequences likely to ensue." *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at 877. A threat of harassment is more than *de minimis*, and therefore substantial, if the "risk" of harassment is both "justified and articulable." *Jud. Watch*, 875 F. Supp. 2d at 47 (citing *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 118 (D.D.C. 2005) (upholding the withholding of employee names where media scrutiny and harassment were likely)).

***a. Identifying Information in Letters of Support***

As discussed in *CMP I*, a substantial privacy interest is attached to the identities of those who wrote letters in support of the University of Pittsburgh's grant application because of the "clear risk that disclosure of the withheld information would likely subject persons associated with fetal tissue procurement and research to targeting, harassment, and potentially violence." 2022 WL 4016617, at *13 (citing First NIH Decl. ¶ 31; Second NIH Decl. ¶ 12). Plaintiff disputes this conclusion on several grounds.

First, plaintiff argues that since the letters of support are "of a professional type and not a personal type," no substantial privacy interest is present. Pl.'s Mem. at 8. According to plaintiff, the letters constitute "professional recommendations that the Tissue Hub grant be approved[,] . . . an approval that came with a hefty taxpayer price tag and possibilities of future professional collaboration," and that revealing the identities of the letters' authors therefore does not intrude on any "personal privacy" interest. *Id.* The D.C. Circuit has counseled, however, that private individuals may have strong personal privacy interests even when acting in their professional capacities. For instance, the D.C. Circuit has held specifically that Exemption 6 "provides greater protection to private individuals, including applicants for federal grants and officials of regulated private companies," than to high-level, public-facing government officials. *Common Cause*, 674 F.2d at 938. That is precisely the situation here, and the authors of the letters of support maintain

their personal privacy interest even when acting as professionals and even when interacting with the federal government. *See, e.g.*, *Jud. Watch*, 449 F.3d at 153 (upholding redactions of the "names and addresses of persons and businesses associated with mifepristone" due to the "danger of abortion-related violence"). The authors' personal privacy interests, namely their interest in avoiding harassment, may be compromised by their professional activities being revealed.

Plaintiff cites two cases as support for its contention that "[c]ourts in this Circuit have . . . differentiated personal and professional information," Pl.'s Mem. at 7 (citing *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392 (D.C. Cir. 1980); *Wash. Post Co. v. U.S. Dep't of Agric.*, 943 F. Supp. 31 (D.D.C. 1996)), but these cases are not helpful. *Board of Trade* dealt solely with the question whether the information at issue there constituted "similar files" to personnel or medical records, 627 F.2d at 396, to hold that only information "of the same magnitude as highly personal or as intimate in nature as that at stake in personnel or medical records" qualified as "similar files," *id.* at 398, but that standard was abrogated just two years later by the Supreme Court, *see Wash. Post Co.*, 456 U.S. at 601-02 (holding that even "nonintimate information about a particular individual . . . can be withheld if its release would constitute a clearly unwarranted invasion of personal privacy"). Even if *Board of Trade* were still good law, plaintiff concedes that the information withheld constitutes a "similar file" within the meaning of Exemption 6, *see* Pl.'s Mem. at 6 n.2, so *Board of Trade* is simply inapposite.

As a second supporting case, plaintiff relies on *Washington Post Co. v. United States Department of Agriculture*, 943 F. Supp. 31 (D.D.C. 1996), which addressed the question whether a list of thousands of commercial cotton farmers—by name, farm address, and the amount of subsidy received from the government—was subject to Exemption 6, *id.* at 33. The Court held Exemption 6 did not apply "precisely because the list [of farmers] is so large and the information

so generic that the individual privacy interests are so small," *id.* at 34, a factual characteristic clearly not applicable in the instant case, where only nine letters of support are at issue, *see CMP 1*, 2022 WL 4016617, at *7 n.9. The *Washington Post* Court explained that "Exemption 6 is designed to protect against unwarranted invasions of *personal* privacy and not typically to protect businesspeople from commercial mailings directed at their business needs," and that where the only privacy interest asserted was in avoiding large volumes of commercial solicitation, the privacy interest was "farfetched." 943 F. Supp. at 35 (emphasis in original). In contrast, the privacy interest asserted here is not to avoid commercial solicitations but the opprobrium from certain elements of society and concomitant safety and harassment risks of being associated with fetal tissue collection and research. Thus, the extremely different facts in *Washington Post* make its reasoning not applicable here.

In addition to its unsuccessful attempt to distinguish the privacy interests that can attach to personal versus professional information, plaintiff argues that "the privacy interests of corporations are not covered by Exemption 6," Pl.'s Mem. at 7 (citing *Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.*, 698 F. Supp. 3d 82, 131 (D.D.C. 2023)), so the withheld institution names in the letters of support should be released because defendant failed to demonstrate "that the institutions themselves had a privacy claim" and the institution names "[are] not personally identifying information as understood under Exemption 6," Pl.'s Reply ¶ 1. That argument likewise fails. Defendant withheld the institution names to protect the individual authors of the letters of support, not the institutions themselves, *see* Third Revised *Vaughn* Index (Jan. 23, 2026) at 22-23, 26, 30, ECF No. 74-3 (justifying the withholding of institution names because "[t]he association of the individual's institution in this letter with human cell research, exposes *the individual* to harassment" (emphasis added)), and the D.C. Circuit has held that a risk of violence can be "fairly

asserted . . . as a privacy interest for both the names and addresses of persons *and businesses* associated with" controversial work, like abortion care or fetal tissue research, to protect individual employees, *Jud. Watch*, 449 F.3d at 153 (emphasis added). Thus, defendant had no obligation to demonstrate the institutions' privacy interests, as releasing the institutions' names risked identification of their employees and interference with those individuals' privacy interests.

As a second line of attack, plaintiff argues that the only basis for believing that the letter authors would be subject to harassment are the declarations of Gorka Garcia-Malene, a FOIA Officer at NIH, and that these "declarations fail to provide adequate foundation for finding a substantial privacy interest" since past versions were "riddled with errors and inaccuracies and cannot be relied upon for accuracy." Pl.'s Mem. at 8.[5] To be sure, defendant's declarations and litigation strategy have been characterized by persistent disorganization and lack of coordination between the agency and government counsel, with the unfortunate result of prolonging this litigation and wasting the time and resources of all involved. When writing the first NIH declaration, the NIH declarant incorrectly believed that GUDMAP tissue was purchased from the University of Pittsburgh by other GUDMAP researchers, when in fact they were given free of charge. *See* Seventh NIH Decl. ¶ 7. Based in part on this incorrect understanding, defendant asserted that Exemption 4 justified withholding the letters of support, since defendant believed these letters were from paying customers of the University of Pittsburgh. *Id.* ¶¶ 5-6. Defendant also asserted, at the time, that Exemption 6 applied to portions of the letters of support. *Id.* ¶ 6; *see also* First NIH Decl. ¶ 29; *CMP I*, 2022 WL 4016617, at *12. Defendant later clarified that NIH lifted the Exemption 4 redactions over the letters of support "early in the pendency of the case," but that decision was not "reduced to writing by either party for the benefit of the Court,"

[5] On reply, plaintiff emphasizes no "argument of bad faith" as to the NIH declarations is being made but rather only that those declarations are "not . . . reliable." Pl.'s Reply ¶ 3.

Seventh NIH Decl. ¶ 6, and the NIH declarant mistakenly continued to defend its Exemption 4 withholdings over the letters of support in its subsequent two declarations, *see id.* ¶¶ 12-17. That failure to identify accurately the justifications for withholdings in the letters of support then infected defendant's briefing and, ultimately, the Memorandum Opinion deciding the first round of cross-motions for summary judgment. *See CMP I*, 2022 WL 4016617, at *7 n.10 (addressing the application of Exemption 4 to the letters of support "in light of defendant's consistent claims in its briefing and declarations that Exemption 4 applies to the letters of support" notwithstanding defendant's ostensible "oversight" of not asserting Exemption 4 in its *Vaughn* indices).

Eventually, while the appeal in this case was pending, defendant realized both the inaccuracies in the first, second, and third NIH declarations and that defendant had been defending its application of Exemption 4 to the letters of support in briefing without actually asserting Exemption 4 over those letters in its *Vaughn* indices or correspondence with plaintiff. *See* Seventh NIH Decl. ¶¶ 6-7.[6] With Exemption 4 out of the picture, defendant additionally concluded that some portions of the letters could be segregated and released, *id.* ¶ 18, and evidently has now made such releases, leading to the narrow challenge plaintiff brings to the redactions of the names and institutions of the letters' authors.[7]

[6] Plaintiff suggests that defendant's statement "that it learned of the erroneous description of the letters of support after Plaintiff filed its appeal . . . plainly contradicts" the NIH declarant's "sworn statement that he discovered the error sometime between December 13, 2021 and February 21, 2022." Pl.'s Mem. at 9 n.5 (citing Def.'s Status Report (July 24, 2024) ¶ 5; Seventh NIH Decl. ¶ 7). That characterization is a stretch since the NIH declarant merely stated that "[o]n January 10, 2022, [he] emailed revised records directly to Plaintiff's counsel with the (b)(4) designations removed from the letters of support." Seventh NIH Decl. at ¶ 6. He did not attest that the designations were removed because he learned that the tissue was provided free of charge at that early stage of the litigation. *Id.*; *see also* Def.'s Status Report (July 24, 2024) ¶ 7.

[7] The other inaccuracy identified in the first NIH declaration—a typographical error about the number of responsive pages misrepresenting that number by one, Seventh NIH Decl. ¶ 9—while perhaps emblematic of the general disorganization and lack of checks on defendant's filings in this matter, does not undermine the overall reliability of the declaration.

Needless to say, this singular inaccuracy and its effects on the defendant's litigation strategy packed an outsized punch in terms of its impact on this litigation's procedural course. Defendant should have more carefully tracked and communicated its decision to lift the Exemption 4 assertion over the letters of support in a declaration and in briefing to the Court, adjusted its litigation strategy not to rely on the inaccuracy once it was discovered, and reviewed its segregability determination immediately after modifying which exemptions were being applied to the letters of support. Nonetheless, no matter the impact of this error, the mistake does not undermine the overall veracity of NIH's declarations on entirely unrelated matters. Moreover, to the extent plaintiff challenges the reliability of the individual declarant, his attestations have been ratified by and reemphasized by the new acting FOIA Officer at NIH. Decl. of Karen Lampe, FOIA Officer, NIH ("Eighth NIH Decl.") ¶¶ 5-10, ECF No. 74-3. Plaintiff's attempts to call into question NIH's statements in various declarations about the harassment, threats, and violence experienced by fetal tissue researchers, based on an inaccuracy in NIH's declarations about the commercial relationship between the University of Pittsburgh and recipients of tissue samples, Pl.'s Mem. at 8, are not persuasive.

Third, plaintiff argues that the "statements regarding harassment and safety fears [in the NIH's declarations] are conclusory, unsubstantiated hearsay statements." Pl.'s Mem. at 9. These declarations, however, set out a sufficient foundation to support the privacy interest asserted, even though the declarant does not attest that he gathered some information from individuals other than himself. *See* First NIH Decl. ¶ 31; Second NIH Decl. ¶ 12. The D.C. Circuit has held that "the most appropriate person to provide a comprehensive affidavit" may rely on "second-hand" information, as long as the information is not overly "speculative" and is in fact based on *someone's* personal knowledge that has been communicated to the declarant. *SafeCard Servs., Inc. v. SEC.*,

926 F.2d 1197, 1201 (D.C. Cir. 1991). Accordingly, courts routinely rely upon declarations based on information not within the declarant's personal knowledge. *See, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 22-cv-3051 (DLF), 2024 WL 3924563, *3 (D.D.C. Aug. 23, 2024), *aff'd,* No. 24-5241, 2025 WL 1122340 (D.C. Cir. Apr. 14, 2025). Defendant's declarations may leave something to be desired in terms of their level of specificity and clarity, but nonetheless NIH's declarant, the FOIA Officer for NIH, attests that his declarations are based on his "personal knowledge and information available to [him] in [his] official capacity," First NIH Decl. ¶ 3, and explains that release of "names of agency and grant staff involved in sensitive research like animal and fetal tissue research" has historically led to "ongoing, unrelenting harassment of the staff by public interest organizations and their supporters," *id.* ¶ 31. He later clarified that this information was based on what the declarant heard from "NIH colleagues" engaged in similar research, as well as his knowledge of government and news reports about violence against fetal tissue researchers and others involved in reproductive health. Second NIH Decl. ¶ 12; *see also Jud. Watch*, 2024 WL 3924563, at *3 (coming to the same conclusion and finding it "reasonable and not unduly speculative to take such risks into account . . . where comparable controversial research is involved"). Plaintiff has repeatedly called into question whether defendant has presented sufficient evidence of the harassment and threats experienced by actual or claimed fetal tissue researchers, and each time this Court has ruled that defendant has provided sufficient evidence. *CMP I*, 2022 WL 4016617, at *13; *CMP II*, 2022 WL 17976633, at *2; *CMP III*, 685 F. Supp. 3d at 17-18.

Finally, in a fourth effort to show the lack of a substantial privacy interest, plaintiff argues that "despite being the institution conducting the human fetal tissue research, Pittsburgh never makes a claim about the fear of harassment or violence befalling their facilities or researchers," but instead is focused on "their competitive edge and being able to continue receiving federal grant

money." Pl.'s Mem. at 11 (citing Yates Decl. ¶¶ 9, 12). Although the Yates declaration does not specifically refer to threats or harassment, Yates does assert that the University of Pittsburgh advocated redaction of "all personally identifiable information to protect the privacy of all individuals working on the project." Yates Decl. ¶ 12. Though Yates focused his declaration primarily on the University of Pittsburgh's competitive interests, and only briefly mentioned the privacy interests of those involved in the grant, this does not detract from the separate assertions by two NIH officials that individuals working on fetal tissue research, or accused of doing so, face threats and harassment. *See* Second Decl. of Karen Lampe, FOIA Officer, NIH ("Ninth NIH Decl.") ¶ 5, ECF No. 79-1; First NIH Decl. ¶ 31.

***b. Physical Description of Magee-Womens Hospital***

This Court previously concluded that information revealing specific site locations within Magee-Womens Hospital where tissue is procured implicates a substantial privacy interest because of "the potential for harm that could result if harassers or those with violence on their minds learned the specific locations within the hospitals where individuals worked on fetal tissue research, procurement, or processing." *CMP I*, 2022 WL 4016617, at *14. Plaintiff revives the issue as to two pages containing a physical description of Magee-Womens Hospital, raising three main arguments in favor of disclosure. *See* Pl.'s Mem. at 13-15.

First, plaintiff, understandably, notes the shifting justifications for withholding this information, namely defendant's inconsistent assertion of Exemption 4 over this information, in addition to Exemption 6, which defendant has consistently asserted over this information. Pl.'s Mem. at 13-14. Those issues, however, may be set aside because defendant has always and continues to assert Exemption 6 over this information and now asserts only Exemption 6. *See* Second NIH Decl., Ex. A, ECF No. 21-1 at 121-122 (showing redactions of document regarding

"Magee Women's Hospital . . . Health Sciences Tissue Bank Magee Laboratory Space," each annotated with both Exemption 4 and Exemption 6); Def.'s Reply at 6-7 & n.1. Thus, whether defendant previously asserted Exemption 4 as a basis for redacting this document is irrelevant.

Second, plaintiff argues that defendant "makes no argument that the information consists of a substantial privacy interest" and instead "simply relies on its February 14, 2023 revised *Vaughn* index" even though "that *Vaughn* index still lists equipment and 'proprietary scientific purposes'" as justifications for withholding under Exemption 4. Pl.'s Mem. at 14. While true that the most recent *Vaughn* index to address these physical descriptions of Magee hospital is dated February 14, 2023, and lists both Exemptions 4 and 6, the justifications for withholding under Exemption 4 and Exemption 6 are stated separately and clearly. *See* Second Revised *Vaughn* Index (Feb. 14, 2023) at 12-13, ECF No. 42-1. These justifications, in conjunction with the explanations provided in defendant's briefing, *see* Def.'s Reply at 6-7, show a substantial privacy interest in this information, for the same reasons already explained by this Court thrice before: revealing the specific, in-building location of facilities used to procure fetal tissue would expose researchers working there to harassment, violence, and targeting.

Third, plaintiff once again challenges the veracity and import of defendant's claims about harassment as a justification for withholding this information. For the reasons explained *supra* in Part III.B.2(a), this Court has already repeatedly considered and rejected plaintiff's assertion that defendant has failed to show a sufficient threat of harassment should individuals' identities be revealed.

Thus, as previously found in this case, defendant has shown a substantial privacy interest in the redacted physical description of Magee-Womens Hospital.

***3. Balancing of Private and Public Interests***

The privacy interests in the records at issue must be balanced against any public interest in disclosure. The "basic purpose of [FOIA] . . . focuses on the citizens' right to be informed about 'what their government is up to,'" and so "information that 'sheds light on an agency's performance of its statutory duties' is in the public interest." *Multi Ag Media*, 515 F.3d at 1231 (alteration and omission in original) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)). Consequently, "a significant public interest in disclosure" exists for records that "will enable the public to more easily monitor whether [an] agency is carrying out its statutory duty." *Id.* at 1232.

***a. Identifying Information in Letters of Support***

As previously decided, the privacy interests of those who wrote letters of support for the University of Pittsburgh's grant application outweigh any public interest in these names, particularly given the D.C. Circuit's caution that "Exemption 6 'provides greater protection to private individuals, including applicants for federal grants and officials of regulated private companies, and to low-level government employees, than to government officials with executive responsibilities.'" *Id.* at *15 (quoting *Common Cause*, 674 F.2d at 938).

To rebut this conclusion, plaintiff asserts that there is a strong public interest in this information, arguing that "[t]he identities of the individuals and institutions who professionally supported the Tissue Hub grant go directly to whom the government relied [on] for assurances of credibility," Pl.'s Mem. at 12, which in turn may "shed light on the government's role in approving the grant, and whether it responsibly maintained oversight—ethically and fiscally," *id.* at 12-13. While not denying that *some* public interest exists in knowing on whose recommendation the government relied in awarding the grant, that interest is far outweighed by the privacy interests

asserted by defendant on behalf of the letters' authors. Much of the content of the letters of support has now been released, allowing the public to evaluate the government's basis for awarding the grant to the University of Pittsburgh, including in light of plaintiff's concerns about the integrity of the University of Pittsburgh's grant administration. *See* Revised Release of Letters of Support; Pl.'s Reply ¶ 8. Given the wealth of information already turned over to plaintiff, any marginal public interest in the names of the authors and their affiliated institutions is substantially outweighed by the privacy interests of those authors, and releasing the names at issue would constitute an "unwarranted invasion of [their] personal privacy." 5 U.S.C. § 552(b)(6). Thus, these names were properly redacted under Exemption 6.[8]

***b. Physical Description of Magee-Womens Hospital***

Plaintiff makes no express argument that the public interest in the physical layout of Magee-Womens Hospital outweighs the privacy interest of the researchers who work there in avoiding harassment at their place of employment. *See* Pl.'s Mem. at 14-15 (discussing these redactions without describing any public interest in this information). If there is any public interest whatsoever in the physical layout of a hospital's research facilities, plaintiff has not said what that may be. Defendant has thus shown that the redacted physical description of Magee falls within Exemption 6.

***c. Foreseeable Harm***

As discussed *supra* in Part III.A.3, "[a]n agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by" one of the nine

[8] On reply, plaintiff also argues that "reliance on fear of harassment and threats as the basis for privacy claims fails for another reason: it is based on an impermissible categorical approach to Exemption 6." Pl.'s Reply ¶ 5. Even if this argument were not raised only on reply—the very last filing in this case to which defendant has had no opportunity to respond—the objection is not borne out by the record, which shows that defendant specified multiple individual categories of information withheld based on privacy and repeatedly reviewed and re-released documents to reveal more and more information. *CMP I*, 2022 WL 4016617, at *16 (discussing this iterative process).

FOIA exemptions. 5 U.S.C. § 552(a)(8)(A)(i)(I). The foreseeable harm of releasing each of these two categories of information—the names and institutions of the authors of the letters of support, and the physical description of Magee-Womens Hospital—is "manifest," *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 372 (D.C. Cir. 2021), after considering the privacy interests at stake. Many of the authors of the letters of support expressly stated their support for the University of Pittsburgh to "develop a Fetal Genitourinary Tissue Bank," *see* Revised Release of Letters of Support at 1-7, another describes a partner institution's ability to "supply[] neonatal tissue from donors with 24-42 weeks of gestation," *id.* at 9, and the remaining letter authors praise the quality of human fetal tissue samples from Pittsburgh's facility, *see id.* at 10-12, all of which foreseeably could subject the authors to potential harassment, ridicule, and even threats of violence, precisely the sort of intrusion on personal privacy that Exemption 6 is intended to prevent, *see* Ninth NIH Decl. ¶ 5.[9] Similarly, the specific locations of tissue labs within Magee-Womens Hospital would foreseeably allow individuals opposed to fetal tissue research to harass and even do harm to researchers who work there. *Id.* The foreseeable harm requirement is thus straightforwardly met.

### C. Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure. 5 U.S.C. § 552(b). Producing segregable information is essential for an agency's FOIA compliance, and "district courts cannot approve withholding exempt documents 'without making

[9] One letter of support provides a positive review of "tissue quality" from "histological samples" sent from the University of Pittsburgh's facility without mentioning that the samples contain fetal tissue. Revised Release of Letters of Support at 10. Although the carefully-worded content of this letter, in isolation, may not engender the aforementioned risk of harassment, ridicule, and threat of violence, its similarity and proximity to the other letters of support assessing tissue quality would subject its author to those risks. *See, e.g.*, *id.* at 11-12.

an express finding on segregability.'" *Machado Amadis*, 971 F.3d at 371 (quoting *Morley*, 508 F.3d at 1123); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.").

In evaluating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117. Even under that presumption, "the agency must provide a 'detailed justification' for [the exempt material's] non-segregability," but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld records, suffice. *Id.*; *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are sufficient for the segregability determination).

NIH has confirmed that it "conducted a page-by-page and line-by-line review of the records" at issue in this case, First NIH Decl. ¶ 16; *see also* Ninth NIH Decl. ¶ 10, and then re-processed the materials multiple times releasing more and more bits of information, "revising its segregability determinations and releasing to plaintiff new copies of challenged records with fewer redactions in several instances," *CMP I*, 2022 WL 4016617, at *16. Additionally, since the case

traveled up to the Circuit, defendant has released even more segregable information with updated *Vaughn* indices. *See* Eighth NIH Decl. ¶¶ 6-7. This satisfies defendant's segregation obligations.

Plaintiff questions whether all of the redacted information pertaining to the physical description of Magee-Womens Hospital truly contains "the precise location of the tissue lab" within the hospital and whether this information could be segregated from other information, particularly given the requirement that any information withheld must be associated with a foreseeable harm. Pl.'s Mem. at 15 & n.7. Defendant has repeatedly attested that line-by-line reviews reveal that the protected information in these documents is "so intertwined with non-exempt material that NIH could not reasonably segregate any portion of the documents for release." Ninth NIH Decl. ¶ 11. An NIH official has additionally attested that after a line-by-line analysis, "NIH determined that releasing any additional information would result in foreseeable harm to the articulated privacy interests associated with the grant awarded to the University of Pittsburgh." *Id.* ¶ 12. This fully satisfies FOIA's requirement that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure." 5 U.S.C. § 552(b).

* * *

In sum, defendant has shown that each withholding challenged by plaintiff was justified by one of the exemptions to FOIA and, accordingly, it is entitled to summary judgment, and plaintiff's cross-motion is thus denied.

## IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment, ECF No. 74, is GRANTED, and plaintiff's Cross-Motion for Summary Judgment, ECF No. 76, is DENIED.

An Order consistent with this Memorandum Opinion will be issued contemporaneously.

Date: August 12, 2026

**BERYL A. HOWELL**
United States District Judge